**UNITED STATES of America, Appellee,**

v.

**Charles William WHALEN, Appellant.**

No. 87–5243.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 17, 1987.

Decided April 13, 1988.

Rehearing Denied May 16, 1988.

Ronald Clabaugh, Rapid City, S.D., for appellant.

Lonnie Bryan, Rapid City, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY and MAGILL, Circuit Judges.

HEANEY, Circuit Judge.

William Whalen, a twenty year old American Indian, was indicted for the premeditated murder of Steven Bergen on the Pine Ridge Reservation in South Dakota in violation of 18 U.S.C. § 1111.[1] A jury found Whalen guilty of the lesser included offense of voluntary manslaughter under 18 U.S.C. § 1112. On appeal, Whalen argues that a prejudicial hearsay statement was improperly admitted at trial.

**BACKGROUND**

Whalen allegedly stabbed Steven Bergen on December 8, 1986 on the Pine Ridge Reservation. Bergen died in the hospital the next day of internal bleeding.

The stabbing occurred at or near a house, located at 703 New Crazy Horse Housing, owned by Emma Whalen, the grandmother of Charles. Charles and Emma and a number of other people were living in the Whalen house: Emma "Mimi" Whalen, the granddaughter of Emma and half-sister of Charles; Regina Brave, the mother of Charles; and Marlin Hawk Wing, the eventual husband of Mimi.

On the evening of December 8, Emma, Charles, Mimi, Regina Brave, and Hawk Wing were at the Whalen home. Except for the grandmother Emma Whalen, all were intoxicated. At approximately 10:30 p.m., Dennis Bear Runner and Steve Bergen came to the door. Bergen knew most of the people in the house. He had been a friend of Mimi Whalen. Bear Runner knew no one. Bear Runner and Bergen were intoxicated.

The testimony of the events which followed is contradictory, with each witness giving a slightly different account. We repeat each of them below.

Mimi Whalen testified as a defense witness. She said that on the evening of December 8, she was downstairs with Hawk Wing. Charles and Emma were upstairs. Emma called for Mimi to come to the door and Mimi went upstairs to answer it. When Bear Runner and Bergen entered, Bergen was swaying. She asked whether he was drunk. Bear Runner told her that Bergen had been stabbed. She helped him to the couch. She stated that she was beside Bergen the entire time he was in the Whalen house, and she never saw anyone stab him.

Bear Runner testified as a prosecution witness. He stated that Bergen was uninjured when they were let into the Whalen home. According to him, while in the house, Bergen and Mimi Whalen were talking in the living room. He was standing by the basement door located between the living room and the kitchen. A single light shone from above the kitchen sink. After standing there for five minutes, the basement door opened, and Bear Runner saw a

---

**1.** Jurisdiction in the district court was predicated on 18 U.S.C. § 1153 which grants jurisdiction to the federal courts for crimes, including murder and manslaughter, committed by an Indian in Indian Country. The parties stipulated to the facts necessary to establish jurisdiction.

man with shoulder length hair, wearing green fatigues, and a short sleeve shirt with yellow stripes come through the door. The man had a knife. Bear Runner warned Bergen that the man had a knife. For a moment, Bear Runner did not move. When he did turn to face Bergen, he noticed Bergen was bent over, holding his stomach. Both he and Mimi Whalen assisted Bergen to the couch.

Bear Runner lifted up Bergen's shirt, saw the stab wound, and "hollered" for someone to call for an ambulance. Although unsure during his testimony, Bear Runner thought "some other boy there" called for the ambulance. While waiting for the ambulance, Bergen said nothing to Bear Runner, except to complain about his stomach. When the ambulance arrived, Bergen walked under his own power to it.

After the ambulance had gone, Bear Runner went down to the basement. He saw a woman sitting alone, whom he later learned was Regina Brave. He told her "those people are crazy. Some other boy up there, a young man, wanted to stab Steve and get out of here."

After returning upstairs, a police officer came to the door. The officer told Bear Runner he was being brought in for protective custody, although he later learned it was for disorderly conduct.

Charles Whalen testified on his own behalf. He said that he, Hawk Wing, and Mimi were in the basement on the evening of December 8. They heard the front door open, and Mimi went upstairs. She called for him. When he went upstairs, Mimi was assisting Bergen. Bear Runner was sitting on the couch. Charles helped Mimi bring Bergen to the couch. Charles claimed he then called the police dispatcher to have an ambulance sent.

After the ambulance came, Charles went back downstairs. Mimi also went downstairs for a moment. Because Charles did not want the police to throw him in jail for drinking, Charles urged Hawk Wing to leave with him. They left out the back door and went to the "bootlegger's." Charles claimed he did not stab Bergen and never told anyone he had. He admitted he generally carried a hunting knife with him and that he did not have it with him when the police arrested him. He said a butcher knife, which the police eventually found in the backyard, was used in some fashion to keep the back door to the house latched.

Marlin Hawk Wing testified as a prosecution witness. He was in the basement of the Whalen house, drinking with Charles and Mimi on the evening of December 8. He said Charles had his hunting knife and a number of other knives, which Hawk Wing thought were steak knives. At some point, Regina Brave, Charles's mother, joined them for a short time in the basement. Someone called downstairs, and Charles went upstairs. Then Mimi went upstairs. When Charles went back downstairs, he told Hawk Wing that he had "stuck Steve." Hawk Wing noticed that Charles did not have the hunting knife Charles usually carried on his belt. Charles urged Hawk Wing to go with him to the bootlegger's. They grabbed their jackets, went upstairs, and out the back door. On the way to the bootlegger's, Charles again admitted stabbing Bergen. On the way back to the Whalen home from the bootlegger's, several Pine Ridge Police officers arrested them.

Sergeant Frank Martinez of the Pine Ridge Police Department testified as a prosecution witness. He responded to the call for the ambulance, which his office received at about 10:25 p.m. When the ambulance arrived at the Whalen home, Bergen was sitting on the couch. Martinez asked several of the people what had happened. Bear Runner told him that juveniles from the neighborhood had attacked Bergen. Sergeant Martinez accompanied the ambulance to the hospital. He was one of the officers who picked up Charles and Hawk Wing at about 1:10 a.m. on their way back from the bootlegger's.

The next day, December 9, 1986, the police obtained a search warrant for 703 New Crazy Horse Housing. Six or seven officers conducted the search and took photographs. In a bedroom used by Charles Whalen's mother, Regina Brave, they discovered the black handled hunting knife

wrapped in a towel in a laundry basket. The butcher knife was found in the backyard.

That same day Bear Runner, Charles Whalen, and Marlin Hawk Wing appeared in the tribal court. While in a courtyard outside the court building, Bear Runner approached Sergeant Martinez. He pointed out to Martinez a man, who at the time was wearing a red sweatshirt, who he thought had stabbed Bergen. That man turned out to be Charles Whalen.

A special agent from the FBI interviewed Dennis Bear Runner that same day, although it is unclear whether this occurred before or after the courtyard identification. The agent testified that Bear Runner could not describe the clothing worn at the time of the stabbing by the man he thought had stabbed Bergen. The agent interviewed Bear Runner again on December 16. At that interview, Bear Runner told the agent that Bergen and Mimi had held their discussion in the kitchen, not the living room. Bear Runner also told the agent that "he went downstairs before the police arrived and observed a young Indian male with green fatigue pants, but did not see any knife."

According to Mimi, Charles Whalen talked to her at the Whalen house a couple days after the stabbing. Charles admitted to her that he had stabbed Bergen. Mimi asked him if he wanted to talk to the captain of the police. He called his mother, Regina Brave, because he wanted to talk to her before talking to the police. Regina Brave also called Mimi and told her that "Charles wasn't to talk to anybody." Regina Brave called a second time, and told Mimi not to say anything to the police because she planned to get an attorney for Charles. She also told Mimi that "she cleaned the knife; she wrapped it in something; and put it in a clothes basket in the back bedroom."

At trial, a number of experts testified. A fingerprint expert determined that neither knife had fingerprints. A hair and fiber expert determined that neither knife had traceable hair or fibers. A serologist found no blood which he could trace to a source, although he did find a speck of blood on the butcher knife. These experts also examined Bergen's clothing and found nothing traceable to anyone other than Bergen himself.

A pathologist examined Bergen's body. He believed that either knife could have caused the stab wound, although he believed the butcher knife was the more likely cause.

## Statement of a Coconspirator

The trial court admitted into evidence, over the objection of defense counsel, the hearsay statement by Mimi Whalen that Regina Brave said she had cleaned the knife, wrapped it in a towel, and placed it in a clothes basket. The district court admitted the statement under Fed.R.Evid. 801(d)(2)(E) as a statement of a coconspirator.[2] Charles Whalen claims this was error because there was insufficient evidence of a conspiracy.

The Supreme court has recently addressed the admissibility of statements of coconspirators. In *Bourjaily v. United States*, — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), an undercover government informant arranged to sell cocaine to one Angelo Lonardo. Lonardo told the informant that a "gentlemen friend" wanted to talk to the informant. The informant spoke with the "friend" about the quality and price of the cocaine. Lonardo and the informant arranged to meet at a place where Lonardo would transfer the cocaine to the car of the "friend." The transaction proceeded. Lonardo placed the cocaine in a car in which William Bourjaily sat. The police arrested Lonardo and Bourjaily and found $20,000 in the car.

Bourjaily was charged with conspiracy to distribute cocaine. At trial, the government introduced, over Bourjaily's objection, Lonardo's conversations with the informant about the "friend." The district court ad-

---

**2.** That section states that a statement is not hearsay if "[t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

mitted the statements under Rule 801(d)(2)(E). The Court of Appeals affirmed the ruling, as did the Supreme Court.

In analyzing the admissibility of the statements, the Supreme Court first determined whether they fell within the definition of the rule. To do so, there "must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'in the course and in furtherance of the conspiracy.'" *Id.* —— U.S. at ——, 107 S.Ct. at 2780. Next, it determined that Federal Rule of Evidence 104(a) required the trial court to apply a preponderance of the evidence standard in assessing the admissibility of evidence.

Here, we have to decide whether the district court properly found by a preponderance of evidence that a conspiracy existed between Charles Whalen and his mother Regina Brave. The district court identified the conspiracy as one to "suppress evidence and to assist the defendant in avoiding the consequences of arrest and trial." The government points to the following evidence of this conspiracy: Charles Whalen often had in his possession a black handled hunting knife, a knife which could have caused the injury to Bergen. Shortly after Bergen was injured, Mimi Whalen saw Charles in the back hallway leading to the bedroom where Regina Brave had been sleeping. The black handled hunting knife was wrapped in a towel and hidden in a laundry basket in that bedroom. Because no fingerprints or hair or other fibers had been found on it, someone may have wiped it clean. Charles did not have the knife when he returned downstairs. He did not have it when the police arrested him. Regina Brave was downstairs while Charles was at the bootlegger's. Two days after the killing, Mimi overheard Regina Brave tell Charles not to speak to the police. When police interviewed him, he said he knew nothing.

In addition to this evidence, the government points to the statement itself—that Regina Brave told Mimi that she had wiped the knife clean and wrapped it in a towel. Before *Bourjaily*, we would have said this statement could not be considered by the court in determining whether a conspiracy existed. *See United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978). *Bourjaily*, however, makes clear that a trial court can consider the statement itself, at least in cases where there is also independent evidence of a conspiracy. —— U.S. ——, ——, 107 S.Ct. at 2780–82.[3] We therefore must consider the statement of Regina Brave about wiping the knife clean in conjunction with the other evidence of a conspiracy.

Nonetheless, we believe the district court committed clear error in finding that a conspiracy existed between Regina Brave and Charles Whalen. A conspiracy requires the existence of an agreement or tacit understanding between coconspirators. *United States v. Miller*, 644 F.2d 1241, 1244 (8th Cir.), *cert. denied*, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 140 (1981). In the context of Rule 801(d)(2)(E), the government must show the likelihood of illicit association between the declarant and the defendant. *United States v. Zamarripa*, 544 F.2d 978, 982 (8th Cir.1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977).

In this case, there is virtually no evidence of an illicit association. Even assuming that Regina Brave wiped the knife clean, we see no evidence of an agreement between her and Charles to do this. There is no evidence that Regina Brave knew of any plans by Charles to stab Steven Bergen. Nor is there evidence that Charles and Regina Brave met or talked after the stabbing. The government assumes that Regina Brave and Charles could have met after the stabbing either in the back bedroom or in the basement. No one testified that Regina Brave was in the back bedroom immediately after the stabbing.

---

3. The majority in *Bourjaily* explicitly refused to address the question whether a conspiracy can be established by a preponderance of the evidence by relying solely on statements which the prosecution is attempting to introduce. —— U.S. ——, ——, 107 S.Ct. at 2780–82.

Hawk Wing testified that only he and Charles were in the basement when they were preparing to go to the bootlegger's.[4] Thus, it is speculation that Charles and Regina Brave had reached an agreement or tacit understanding concerning what to do with the hunting knife after the stabbing.

The only conclusion to which this evidence leads is that Regina Brave wanted to protect her son (or someone else) and therefore she cleaned the knife. She could have found the knife on her own or been told about it by any number of persons. This, however, in no way shows that she undertook this action in concert with Charles.

The government also claims Regina Brave's instruction to Charles that he should not say anything to the police was evidence of a conspiracy to suppress evidence. We cannot view urging the exercise of the constitutional right to remain silent to be an agreement to perform any kind of an illicit act.[5]

The finding that Regina Brave and Charles Whalen formed a conspiracy to suppress evidence is not supported by a preponderance of the evidence. We therefore conclude that the district court erred in admitting the hearsay statements of Regina Brave, as statements by a coconspirator.

### Harmless Error

■ The government claims that even if the statement was improperly admitted, such admission constituted harmless error. *See* Fed.R.Crim.P. 52(a). An appellate court must reverse if it finds that the jury may have been "substantially swayed" by the improper admission of the evidence. *See United States v. Ray,* 768 F.2d 991, 995 (8th Cir.1985) (citing *United States v. Kotteakos,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

We are convinced that the error was harmless. As the government observes, it did not emphasize to the jury the importance of the statement. It came out on the cross-examination of Mimi Whalen and was mentioned in only one sentence of the government's closing argument.

The evidence against Charles was quite strong. It showed that the hunting knife was one of at least two possible weapons used in the stabbing; that Charles often carried the hunting knife and had access to other knives in the household; that Charles wanted to leave the house soon after the alleged stabbing; and that Bear Runner had identified Charles as the assailant.

More importantly, Hawk Wing and Mimi testified that Charles admitted stabbing Bergen. The defense contends that Mimi, Hawk Wing, and Bear Runner were drunk at the time of the stabbing; were convicted felons; had motives to lie; and had vastly differing explanations of what happened on December 8.

The defense is correct in observing that Mimi, Hawk Wing, and Bear Runner gave very different accounts of what happened on December 8. Bear Runner's testimony also differed in certain key respects from what he told the FBI special agent. But, Charles Whalen's testimony differed substantially from that of a primary defense witness, Mimi Whalen. For example, Mimi said she was alone with Hawk Wing in the basement when Bergen and Bear Runner came to the door. Charles and Hawk Wing said the three of them were in the basement together. Charles said Mimi called for him to come upstairs after Bergen and Bear Runner came to the door. Mimi claims she never called for him. Thus, neither the defense nor prosecution witnesses gave consistent explanations of the events.

---

4. Immediately after the alleged stabbing but before the police came to the Whalen home, Running Bear claims he went downstairs and saw no one else but Regina Brave. This could only have occurred after Hawk Wing and Charles Whalen had gone, since Hawk Wing and Charles were in the basement until they left for the bootlegger's.

5. The government also claims Regina Brave's statement should have been admissible to explain other evidence. In support, the government cites *Zamarripa,* 544 F.2d at 982. We disagree. In this case, it is clear that the statement was admitted to prove the truth of the statement that Regina Brave cleaned the knife.

While the defense is correct that Hawk Wing had a possible motive to lie—he was originally a suspect—a jury likely would not believe he would lie to implicate Charles Whalen, a friend, instead of some unknown "juvenile" or one of the other suspects such as Bear Runner.

Mimi's testimony, however, is the most damaging to the defense. Her statement that Charles admitted stabbing Bergen came on cross-examination after she had given testimony on direct examination which had been very favorable to Charles. Mimi had no motive to exculpate her brother on direct examination and then lie in order to inculpate him on cross-examination. The evidence also does not show she was drunk when Charles confessed to the stabbing.

In any event, if the defense is correct that the jury might not have found Mimi a credible witness, this lack of credibility would presumably extend to her claim of what Regina Brave told her about having cleaned the knife. If the jury did not find Mimi's statement regarding the confession credible, there would be no reason for it to have found Mimi's statement about the cleaning of the knife credible, and the prejudicial effect of the statement would be minimal.

**CONCLUSION**

Although the government did not establish a clear motive, and its witnesses did not clearly explain the course of events at the Whalen home on December 8, there was quite strong evidence of guilt. Moreover, the hearsay statement, which was improperly admitted, could not have had a substantial effect on the jury's verdict. The government did not emphasize its importance to the jury and other evidence was clearly much more damaging.

For these reasons, we find the district court's admission of the hearsay statement of an alleged coconspirator to be harmless error. We, therefore, affirm Charles Whalen's conviction for voluntary manslaughter.