**UNITED STATES of America, Appellee,**

v.

**Cedric L. ROULETTE, Appellant.**

No. 95–2526.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1995.

Decided Feb. 1, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied March 20, 1996.

Glenn E. Bradford, Kansas City, Missouri, argued, for appellant.

Marietta Parker, Assistant U.S. Attorney, Kansas City, Missouri, argued, for appellee.

Before FAGG, Circuit Judge, BRIGHT, Senior Circuit Judge, and DUPLANTIER,* Senior District Judge.

DUPLANTIER, Senior District Judge:

Defendant Cedric Roulette was convicted after trial by jury of conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) & 846. Roulette was also convicted of two counts of distributing and causing to be distributed five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B), and one count of using a firearm in relation to the distribution of cocaine base in violation of 18 U.S.C. § 924(c)(1). He appeals his conviction, contending that the trial judge made several erroneous evidentiary rulings and that he should have been granted a new trial because of evidence discovered after his trial. Defendant also argues that the judge should have directed a verdict on the gun count.

As to the gun count, the government concedes that *Bailey v. United States,* decided after Roulette's trial, controls and that the guilty verdict as to this count should be set aside. —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). We conclude that the trial judge did not err in his evidentiary rulings or in denying a new trial and therefore affirm the judgment except as to Count Four, the gun count.

## I. Factual Background

Roulette's participation in the drug conspiracy was primarily established by the testimony of detective Ray L. Tisinger, a Kansas City Police detective working undercover. The following is a summary of Tisinger's testimony.

* The HONORABLE ADRIAN G. DUPLANTIER, Senior United States District Judge for the Eastern District of Louisiana, sitting by designation.

Roulette's first sale occurred on January 8, 1990, when detective Tisinger arranged to buy one ounce of cocaine base through Freddie Barker, an unwitting intermediary who had previously purchased crack cocaine for Tisinger. While accompanied by Tisinger, Barker arranged for the sale of the crack cocaine by telephoning his source from a gas station. Tisinger and Barker then drove to the McDonald's restaurant across the street from the gas station to buy the drugs.

After Tisinger and Barker parked next to the McDonald's building, a white station wagon arrived, from which Roulette exited, accompanied by his co-defendant, Charles Harrison, Jr. Barker walked into the restaurant; Roulette and Harrison joined him. Barker then returned to Tisinger's car, where he reported to Tisinger that an ounce of cocaine would cost him $1,200. After Tisinger gave Barker the $1,200, Barker walked back into McDonald's, where he again met with Roulette[1]. Barker and Roulette then walked toward the men's bathroom of the restaurant. A moment later, Barker walked outside again to Tisinger's car and handed Tisinger 27.8 grams of crack cocaine wrapped in aluminum foil.

Roulette then walked out of the restaurant and came up to the passenger side rear window of Tisinger's car, while Tisinger remained in the front driver's seat. Roulette stood by the passenger side and bent down at a 45 degree angle such that detective Tisinger could clearly see his face. Roulette stated, "It's cool," and then handed Barker a piece of paper with a pager number. Barker then informed Tisinger that Tisinger could use the pager number to deal directly with Harrison. Detective Tisinger thus observed Roulette both inside the well-lit McDonald's and while he stood at the rear passenger door of Tisinger's car.

A second Kansas City Drug Enforcement officer, James T. Edding, testified that on the same date, January 8, he watched Harrison and a companion, whom Edding later confirmed to be Roulette, exit a drug distribution house at 3811 East 57th Street which he had under surveillance. Edding watched Harrison and Roulette get into a white sta-

tion wagon and followed their car to McDonald's, where Tisinger bought the crack cocaine.

A second drug purchase occurred on the following day, January 9. Detective Tisinger used a pay phone at Clark's Service Station to page the number which Barker and Roulette had given him on the previous day. A male responded to Tisinger's page and agreed to send a runner to bring an ounce of crack cocaine to Tisinger. Fifteen minutes later, a white Ford Pinto pulled up next to Tisinger's car at the service station. Tisinger got out of his car and sat in the Ford Pinto next to the driver, whom Tisinger later identified as Cedric Roulette. Tisinger recognized Roulette as the same person whom he had seen on the previous day at McDonald's. Tisinger handed Roulette $1,200, and Roulette handed him an aluminum foil package containing 28.0 grams of crack cocaine. Tisinger made the face-to-face purchase of cocaine from Roulette while sitting next to him.

Two other officers from the Drug Enforcement Unit also testified that they observed Roulette on January 9. Detective Donald Birdwell had Clark's Service Station under surveillance with binoculars on that afternoon. Shortly after 3:00 P.M., Birdwell saw Tisinger get out of his car and into the white Ford Pinto which Roulette was driving. Birdwell observed Roulette seated in the white Pinto and recognized him from a previous investigation. After Tisinger exited the car, Birdwell followed Roulette's white Pinto to 5409 Kensington Street and observed Roulette talking with Harrison outside the residence.

In addition, Detective Edding also saw Roulette pull up to the residence at 5409 Kensington Street which he had under surveillance on January 9. Edding had observed Roulette the day before at 3811 East 57th Street and at the McDonald's drug purchase. Edding saw Roulette exit his car and meet with Harrison on the porch of the house. The residence belonged to Harrison's mother and was later searched by police, who recovered cocaine base and tools of the drug trade from the house.

1. Tisinger testified that he observed all of this activity clearly from his car parked a short distance from the well-lit restaurant, through its glass front wall.

One hour after completion of the second drug sale, Tisinger positively identified Cedric Roulette from a photographic lineup as the person with whom he dealt on January 8 and 9. In his testimony, Detective Tisinger never expressed any doubt that Roulette was the person who sold him drugs on the dates in question.

## II. The Laboratory Reports

■ Roulette contends that the district court erred by admitting into evidence laboratory reports which identified the substance involved in the case against Roulette as cocaine base, without requiring testimony by the person who conducted the tests or proof of her unavailability. Roulette does not challenge the reliability or routine nature of the reports.

Roulette argues that Federal Rule of Evidence 803(6) is inapplicable because the reports were not "kept in the course of a regularly conducted business activity." This contention is foreclosed by the explicit contrary holding in *United States v. Baker*, 855 F.2d 1353, 1359 (8th Cir.1988) (laboratory reports identifying controlled substances are admissible as business records under Rule 803(6)), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989).

■ Roulette argues alternatively that admission of such reports without proof of the unavailability of the person who prepared the reports violates the Confrontation Clause of the Sixth Amendment. *Baker* held that "[f]irmly rooted exceptions to the hearsay rule do not violate the Confrontation Clause." *Id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987); *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). The admission of such government laboratory reports under the business records exception provides such a firmly rooted exception. *Id.* Roulette contends that *Baker* is not controlling in this case because the government did not prove that the lab technician was unavailable to testify. Nothing in the *Baker* opinion suggests that the holding is predicated upon the unavailability of the person who prepared the lab report; the opinion does not discuss the issue. In an analogous situation, the U.S. Supreme Court has held that the Confrontation Clause does not require proof of unavailability for admission of co-conspirator statements under Rule 801(d)(2)(E). *United States v. Inadi*, 475 U.S. 387, 399–400, 106 S.Ct. 1121, 1128–29, 89 L.Ed.2d 390 (1986). We reach the same conclusion as to business records under Rule 803(6); the district court properly admitted the laboratory reports.

## III. Testimony of Janice Compton

■ Roulette contends that the district court erred when it allowed the testimony of Janice Compton, a government rebuttal witness, to impeach the testimony of Charles Harrison, Jr., a defense witness who was charged as Roulette's co-conspirator in the same indictment as Roulette and who had already pled guilty.

The government offered the testimony of Janice Compton to impeach Harrison's testimony at trial with prior inconsistent statements he made to Compton during an earlier interview. Compton served as Harrison's probation officer and conducted the interview while she was preparing his presentence report. On direct examination, Harrison stated that he had no contact with Roulette during 1990. Defense counsel then asked Harrison if he had ever asked Roulette to sell crack cocaine on his behalf during 1989 or 1990; Harrison responded that he had not. Defense counsel also asked Harrison if he had seen Roulette in 1987 and 1988. Harrison replied that he had seen Roulette in 1987 and 1988 on only a few occasions, and that on such occasions he and Roulette had gone to the movies or gone out together socially.

On cross examination, the government asked Harrison how many times he had been present when Cedric Roulette had sold drugs. Harrison responded that he had never been present when Roulette sold drugs. The government then asked Roulette if he had not stated to Compton in an earlier interview that he had been with Roulette on two or three occasions when Roulette had sold cocaine while Harrison had remained in a car without participating in the sales. Harrison responded that he had told Compton that he had seen Roulette with cocaine or

drugs in 1988, but he had never seen Roulette sell drugs in exchange for money.

The government later called Compton to testify as a rebuttal witness to impeach Harrison's trial testimony with his prior inconsistent statement. Roulette objected to Compton's testimony as impeachment by extrinsic evidence on a collateral issue. Roulette argued that the government was bound by Harrison's answers under cross examination concerning his prior inconsistent statements and could not use extrinsic evidence to further impeach him. The government contended that it was offering Compton's testimony to impeach Harrison's testimony that he had not told Compton that he had witnessed Roulette selling drugs. The trial judge allowed Compton to testify that Harrison had told her that he was with Roulette "on two or three occasions when Roulette would go up to the house and sell the cocaine."

■ A trial court's determination of the admissibility of evidence will not be overturned except for a clear abuse of discretion. *United States v. Houston,* 892 F.2d 696, 705 (8th Cir.1989) (citing *United States v. Jones,* 687 F.2d 1265, 1267 (8th Cir.1982)). At trial, the government contended that Compton's testimony was offered to impeach Harrison's testimony with prior inconsistent statements. Extrinsic evidence of prior inconsistent statements may not be used to impeach a witness under Federal Rule of Evidence 613(b) unless the witness is given the opportunity to explain or deny the statements. *United States v. White,* 11 F.3d 1446, 1448 (8th Cir.1993). Harrison was given such an opportunity and both denied and explained the prior inconsistent statement. However, under 613(b) a witness may not be impeached on a collateral matter by use of extrinsic evidence of prior inconsistent statements. *United States v. Grooms,* 978 F.2d 425, 428 (8th Cir.1992); *United States v. McCrady,* 774 F.2d 868, 873 (8th Cir.1985). Contradiction of a witness by prior inconsistent statements may be shown only on a matter material to the substantive issues of the trial. *Grooms,* 978 F.2d at 429; *McCrady,* 774 F.2d at 873. A prior inconsistent statement contains collateral matter and is therefore inadmissible if the facts referred to in the statement could not be shown in evidence for any purpose independent of the contradiction.

*McCrady,* 774 F.2d at 873 (quoting *United States v. Harris,* 542 F.2d 1283, 1306 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977)).

Harrison's statement to Compton involved matters which were material to the charges against Roulette and could have been offered in evidence independent of the contradiction. The substance of Harrison's statement is admissible evidence because it relates to multiple drug transactions involving both Harrison and Roulette. Such activities tend to prove the existence of the charged drug conspiracy and add weight to the government's evidence that Roulette later dealt drugs repeatedly on behalf of Harrison.

■ In addition, Compton's testimony is admissible to contradict Harrison's testimony on direct examination that his infrequent contact with Roulette from 1987 to 1990 involved only innocent activities, such as going to movies. Once the defendant elicited such evidence from Harrison, the government was free to rebut Harrison's testimony with the statement he had made to Compton describing drug activity. *See Westcott v. Crinklaw,* 68 F.3d 1073, 1078 (8th Cir.1995); *United States v. Valencia,* 61 F.3d 616, 619 (8th Cir.1995). The trial court did not err in admitting Compton's testimony.

### IV. Evidence of Defendant's Prior Possession of Cocaine

■ The two substantive counts upon which defendant was convicted involve transactions which occurred on January 8 and 9, 1990. Roulette claims that the trial court erred in admitting the following testimony of Trooper James Ripley concerning an incident which occurred on November 21, 1989. Ripley stopped Roulette's car because of expired license plate tags, and then discovered that Roulette was driving with a suspended driver's license. In searching the vehicle, Ripley found .059 grams of powder cocaine wrapped in plastic bags inside the pocket of Roulette's jacket. The indictment upon which defendant was convicted charged that the conspiracy involving Roulette and Harrison began on March 20, 1989. Thus the evidence of Roulette's possession of cocaine powder on November 21, 1989 falls within the period of the charged conspiracy.

In fact, the possession occurred only a few weeks prior to Tisinger's initial meeting with Barker, and less than one month before Tisinger purchased crack cocaine from Roulette. The trial court thus did not err by admitting evidence of the possession of drugs on a date prior to the two incidents charged in the substantive counts, but within the conspiracy period, as direct evidence of the charged conspiracy. Any drug activity by a conspirator during the conspiracy is relevant evidence of the existence of the conspiracy. *See United States v. Brown*, 956 F.2d 782, 786 (8th Cir.1992) (citing *United States v. Jones*, 880 F.2d 55, 59 (8th Cir. 1989)).

## V. Admission of Co–Conspirator Statements

Roulette contends that the court erred in admitting as co-conspirator statements conversation between Freddie Barker and Detective Tisinger. Roulette argues that the government submitted no evidence as to the reliability of the hearsay statements, that there was insufficient foundation to show that the co-conspirator statements were made during the course or in furtherance of the drug conspiracy, that admitting the statements violated Roulette's Sixth Amendment right of confrontation, and that the trial court erred by failing to make proper *Bell* findings. *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978) (laying out the procedure for the admission of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E)).

Under Federal Rule of Evidence 801(d)(2)(E), an out-of-court statement of a co-conspirator is admissible if the trial court is satisfied by a preponderance of the evidence that the statement was made during the course and in furtherance of a conspiracy to which the declarant and the defendant were parties. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); *Bell*, 573 F.2d at 1043. In making this determination, the trial court can consider the hearsay statement itself. *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781; *United States v. Whalen*, 844 F.2d 529 (8th Cir.1988). Moreover, inquiry into indepen-

dent indicia of the reliability of the statements is not required. *Bourjaily*, 483 U.S. at 182, 107 S.Ct. at 2782. There is no doubt whatsoever that the statements of Barker during the drug sales as related at trial by Detective Tisinger were during the course of and in furtherance of the conspiracy between Barker and defendant Roulette.

In response to defendant's objection at a conference before trial, the court stated that it would make the appropriate *Bell* findings regarding admission of co-conspirator statements later in the trial. The court cautioned the prosecution to connect such statements to the existence of the conspiracy. The testimony of the government's first witness, Detective Tisinger, provided sufficient evidence to establish the existence of a conspiracy involving Roulette and Freddie Barker. Barker brought Tisinger to McDonald's, where he met with Roulette and Harrison to obtain crack cocaine on Tisinger's behalf. Barker also provided Tisinger with a pager number which Tisinger used the following day to buy drugs directly from Roulette. Though other police officers also observed both drug transactions, Tisinger's testimony alone provided enough evidence to admit Barker's statements as co-conspirator statements in furtherance of the conspiracy with Roulette.

During Tisinger's testimony, Roulette objected to all statements by Barker which Tisinger related at trial. Consistent with the procedure laid out in *Bell*, the trial court overruled Roulette's objection and admitted the statements on the assumption that it would make the appropriate finding as to the existence of the conspiracy later in the trial. *Bell*, 573 F.2d at 1044. "*Bell* requires district courts to admit conditionally the hearsay statements of alleged co-conspirators, subject to a final on-the-record ruling that the statement is admissible under the co-conspirator exception to the rule against hearsay." *United States v. Coco*, 926 F.2d 759, 761 (8th Cir.1991) (citing *Bell*, 573 F.2d at 1044). Although the judge did not make a final explicit *Bell* ruling, he substantially complied with *Bell*'s procedures[2]. *Id.* A number of cases have held that *Bell* proce-

---

**2.** In a conference after the close of defendant's case, the trial judge stated that with regard to the

Eighth Circuit's Model Jury Instruction 5.06, discussing co-conspirator's statements, "[W]e had

dures are flexible. *United States v. Legato,* 682 F.2d 180, 183 (8th Cir.1982) (citing *United States v. Baykowski,* 615 F.2d 767, 771 (8th Cir.1980); *United States v. Littlefield,* 594 F.2d 682, 686 (8th Cir.1979)), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982). Also, we will not reverse for failure to follow *Bell* procedures absent a showing of prejudice. *United States v. O'Meara,* 895 F.2d 1216, 1219 (8th Cir.1990), *cert. denied,* 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990). Roulette was not prejudiced by the failure to follow precise *Bell* procedures in light of the overwhelming evidence of the conspiracy. Moreover, the defendant did not ask for a *Bell* ruling at the close of the evidence[3].

We conclude that no reversible error occurred in the admission of any co-conspirator statements or in the failure to follow *Bell* procedures precisely.

## VI. Motion for a New Trial Based on Newly Discovered Evidence

Defendant contends that the district court erred by not granting a new trial based on newly discovered evidence. On the day the jury returned a guilty verdict against Roulette, Cheryl F. Harrison, the mother of Charles Harrison, Jr., told defense counsel that Donald Riddlespringer had stated to her that he, and not Cedric Roulette, had sold crack cocaine to Freddie Barker at McDonald's. The district court held a hearing on Roulette's motion for a new trial based upon this and other new evidence. At the hearing, Cheryl Harrison's testimony proved less than credible. She admitted to confusing Donald Riddlespringer with his brother, George Riddlespringer. She testified that George initially confessed to participating in the January 8, 1990 drug sale at McDonald's; she then explained that she had confused the two brothers and that Donald had later con-

fessed to her also. Mrs. Harrison also could not establish the date of the drug deal to which Donald Riddlespringer allegedly referred. Cheryl Harrison's daughter, Carolyn Harrison, also testified for the defendant at the hearing. Carolyn testified that Donald Riddlespringer had admitted to her on several occasions that he was the individual who sold drugs to Detective Tisinger on January 8, 1990. The defense also presented the sworn statements of two other individuals, Bonita Hill and Tanis McGaugh. Hill stated that Riddlespringer admitted to her that he had sold the drugs at McDonald's on the day in question, while McGaugh stated that Riddlespringer had failed to deny that he had made the January 8 drug sale. At the hearing on the motion for new trial, Donald Riddlespringer testified that he did not sell any crack cocaine at McDonald's on January 8, 1990[4]. Riddlespringer also denied admitting any participation in such a drug sale to Cheryl Harrison or anyone else.

In order to get a new trial based on newly discovered evidence, Roulette must demonstrate "(1) the existence of new evidence, (2) due diligence, (3) the relevance of the evidence to a material issue, (4) the probability that evidence would lead to an acquittal on retrial, and (5) that the evidence 'is not merely cumulative or impeaching.'" *United States v. Turk,* 21 F.3d 309, 312 (8th Cir. 1994) (citing *United States v. Johnson,* 12 F.3d 827, 833 (8th Cir.1994) (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 1860, 128 L.Ed.2d 482 (1994)). The district court's decision on whether to grant a new trial on such a motion will not be reversed absent a clear abuse of discretion. *Johnson,* 12 F.3d at 833–34 (citing *United States v. Provost,* 921 F.2d 163, 165 (8th Cir.1990), *cert. denied,* 499 U.S. 968, 111 S.Ct. 1603, 113 L.Ed.2d 666 (1991)).

some doubt about that, whether there was evidence but then we finally decided." Though defense counsel was present during the discussion of Jury Instruction 5.06, he made no comment regarding co-conspirator statements and made no request for a another *Bell* ruling.

3. "A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains." *United States v. Hoelscher,* 914 F.2d 1527, 1543 (8th Cir.1990) (quoting *United States v. Nance,* 502 F.2d 615, 621 (8th Cir.1974) (citation omit-

ted), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975)), *cert. denied, Giuffrida v. United States,* 498 U.S. 1090, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991).

4. After the trial, both parties stipulated as to the expected testimony of Freddie Barker for the hearing on Roulette's motion for a new trial. Special Agent John E. Prickett related Barker's stipulated testimony from an interview with Barker which he and defense counsel attended. Barker denied that he had ever dealt drugs with Charles Harrison, but remembered him as part

We agree with the trial court that the "new evidence" was insufficient to justify a new trial because there was no probability that the evidence would lead to an acquittal on retrial[5]. The testimony of the defendant's witnesses lacked credibility, especially since they did not come forward at Roulette's trial. Cheryl Harrison and Bonita Hill had both testified at the trial. Neither mentioned any confession by Donald Riddlespringer to the court or to Roulette's attorney prior to or during the trial. Moreover, none of the "new evidence" related to Roulette's face-to-face cocaine sale to Detective Tisinger on January 9, 1990, the strongest evidence against Roulette. Immediately after this second purchase, Detective Tisinger identified Roulette as the individual from both the January 8 and January 9 sales. Tisinger's identification of Roulette, and the confirmation of his identification by two other detectives, provide overwhelming evidence of Roulette's guilt. Roulette's "new evidence" would have little or no probability of leading to an acquittal on retrial. The trial court did not abuse its discretion in denying Roulette's motion for a new trial based on newly discovered evidence.

### VII. Remand for Re–Sentencing

U.S. Sentencing Guidelines, § 2D1.11(b)(1) lists the following as a "Specific offense characteristic": "if a dangerous weapon (including a firearm) was possessed, increase by two levels [the base offense level]." This provision was not considered by the district court in imposing sentence on Counts 1, 2 and 3, because Guidelines § 2K2.4, Application Note 2, provides that when a defendant is sentenced to the five year consecutive minimum sentence under 18 U.S.C. § 924(c), a specific offense characteristic for possession of a firearm is not to be applied to the guideline for the underlying offense. The

government urges, and we agree, that Counts 1, 2 and 3 should be remanded to the district court for re-sentencing. The prohibition against applying the two level enhancement is no longer applicable, because the firearm sentence on Count 4 has been set aside. We express no opinion whether a two level enhancement if a firearm "was possessed" § 2D1.11(b)(1), read together with the relevant conduct provision (§ 1B1.3), should be applicable here, when a prosecution under 18 U.S.C. § 924 is not possible under *Bailey*. This determination in the first instance is for the district judge on remand.

We affirm the conviction of the defendant on Counts One, Two, and Three. We reverse defendant's conviction on Count Four in light of *Bailey*, — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

---

of a familiar group. Barker also stated that Cedric Roulette was not involved in the drug transaction at the McDonald's, and that he had only dealt drugs there on that one occasion. Barker could not identify Donald Riddlespringer as the individual who had sold him drugs at McDonald's. During the course of the interview, Barker also stated that he remembered that one of the individuals at McDonald's was named "Donald" and that he thought the other individual was named "Terry."

5. Defendant filed his motion for new trial within seven days of the verdict, and he argues that a "lesser standard of interest of justice" applies to

such a motion. We agree with the district court that this Circuit has not yet decided whether there is a relaxed interest of justice standard for new trial motions filed within seven days of a verdict, as Roulette contends. The Eighth Circuit cases which defendant cites, *United States v. Fiddler*, 688 F.2d 45 (8th Cir.1982), and *Edwards v. United States*, 361 F.2d 732 (8th Cir.1966), do not so decide. We do not reach this issue, because even under a hypothetical relaxed standard, the defendant's new evidence would not support reversal of the district court's denial of defendant's motion for new trial.