United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3255

_____

United States of America,            *
                                     *
            Appellee,                *
                                     *
    v.                               *
                                     *
Bobby Michael Chard,                 *
                                     *
            Appellant.               *

_____

                                 Appeals from the United States
No. 96-3990                      District Court for the
                                 Western District of Missouri.
_____

United States of America,            *
                                     *
            Appellee,                *
                                     *
    v.                               *
                                     *
Robert Donald James,                 *
                                     *
            Appellant.               *

_____

Submitted: April 17, 1997
Filed:  June 18, 1997

_____

Before LOKEN, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MAGILL, Circuit Judge.

Bobby Michael Chard and Robert Donald James were found guilty by a jury of aiding and abetting the possession of methamphetamine with the intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (1994). In addition, the jury found James guilty of conspiring to manufacture methamphetamine, in violation of 21 U.S.C. § 846 (1994). Both Chard and James appeal their convictions. Chard argues that his conviction should be reversed because: (1) the district court[1] erred by denying his motion for severance; (2) the district court erred by allowing the expert testimony of John Meyers, senior forensics chemist for the Drug Enforcement Agency (DEA); and (3) the evidence was insufficient to support his conviction. James argues that the district court erred by admitting evidence to impeach the testimony of a defense witness. We affirm.

**I.**

On March 15, 1996, the police executed a search warrant on Chard's house in Independence, Missouri. Chard was in the house when the police arrived and Chard was arrested. Chard told DEA agent L. D. Mathews that James and James's family lived in the house. James was not present when the police executed the search warrant. Chard also told agent Mathews that Chard only maintained a bedroom in the house. James was arrested later.

---

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

Upon searching Chard's house, the investigating officers found methamphetamine and numerous items related to the manufacture of methamphetamine. In the basement, the officers found a well-stocked methamphetamine-manufacturing laboratory containing the ingredients used to make methamphetamine as well as a

variety of glassware used in the manufacture of methamphetamine. For example, in the laboratory the officers found a 6000-milliliter Erlenmeyer flask, several round-bottom flasks, and several 1000-milliliter Pyrex filter flasks. The officers also found a glass container, still in the manufacturer's packaging, labeled Mallinckrodt hydriodic acid, two five-gallon containers labeled hydrochloric acid, boxes of glass beakers and test-tubes, several scales and balances, a hot plate, a heat-sealer machine, empty acetone and Coleman fuel cans, a bottle of nicotinamide powder that could be used as a cutting agent for methamphetamine, and 240 bottles of Mini-thin ephedrine tablets containing 250 tablets each. Mini-thin tablets can be easily converted into a chemical agent that is commonly used in the production of methamphetamine.

In Chard's bedroom, the investigating officers found a digital scale, distribution-sized quantities of powdered methamphetamine in plastic baggies, a copy of the book "Secrets of Methamphetamine Manufacture," a binder that contained photocopied pages from that book, and an address book listing an address where Mini-thin ephedrine tablets can be purchased. In James's bedroom, the investigators found police scanners and radio equipment of the type used by drug dealers for counter-surveillance, a plastic baggie containing methamphetamine, and some handwritten papers referring to "dope" and "meth" dealing.

In Chard's truck, the investigators found items commonly used for the manufacture of methamphetamine, including a plastic baggie containing 83 grams of

nicotinamide powder, two 550-gram empty cans of red phosphorous, a Red Devil lye can, and numerous acetone and Coleman fuel cans.  The investigators also found  a box containing 248 empty bottles of 250-count Mini-thin ephedrine tablet bottles.

In James's truck, the investigators found six, pint-size jars of a liquid that contained methamphetamine, a bottle of Mini-thin ephedrine tablets like the ones found in Chard's truck and the basement, a plastic baggie containing 32.4 grams of red phosphorous, and one jar of iodine crystals.  A sample of the liquid from one of the

pint-size jars of methamphetamine solution contained 279 milligrams per milliliter of D-methamphetamine, which can produce 132 grams of powder D-methamphetamine. Further testing of three of the five other jars revealed that they also contained similar amounts of D-methamphetamine solution which could produce between 114 and 143 grams of powder D-methamphetamine each.

On April 12, 1995, Chard and James were both charged by a grand jury with various crimes relating to the manufacture and distribution of methamphetamine. On April 17, 1995, Chard, who had been released pending trial, went to the DEA office and gave to agent Mathews an envelope of papers. The envelope contained lists of items commonly used to manufacture methamphetamine, such as filters, butane gas, trash bags, ice, gloves, water, Coleman fuel, red phosphorous, and P2P, a reference to the chemical agent methylamine which is used in the process of cooking methamphetamine. The papers also contained several drawings of apparatuses that are used to manufacture methamphetamine. Some of the papers were stained with red phosphorous. There were also papers with notations of police scanner frequencies that could be used for counter-surveillance efforts. Chard stated that all of these papers belonged to James and that Chard himself had nothing to do with any criminal activity that may have been taking place in his house.

Before trial, Chard moved the district court to sever Chard's trial from James's trial. The district court denied Chard's motion.

At trial, the prosecution sought to prove that Chard and James had manufactured methamphetamine in Chard's

house using the ephedrine reduction method. After several of the investigating officers testified regarding the results of the search, DEA agent Mathews and DEA senior forensics chemist Meyers explained to the jury how, using the ephedrine reduction method, methamphetamine could be manufactured by using the chemicals found in the trucks and the house. Agent Mathews also testified that, although he tested samples of many of the other ingredients found in the house and

the trucks, he did not test the contents of the bottle labeled hydriodic acid, a necessary ingredient to produce methamphetamine using the ephedrine reduction method. Agent Mathews testified that he did not test this bottle because the bottle was clearly labeled and found in its original packaging, and also because the fumes of hydriodic acid can be life threatening.

During Chard's cross-examination of agent Mathews, Chard attempted to elicit from agent Mathews the statements Chard made when Chard was arrested. Specifically, Chard wanted agent Mathews to testify that Chard told agent Mathews that James and not Chard was living in the house owned by Chard. James's attorney objected to this line of questioning, and the district court sustained the objection. Chard was also not allowed to ask agent Mathews about the allegedly exculpatory statements that Chard made when Chard visited agent Mathews at the DEA office.

During senior forensics chemist Meyers's testimony, the government asked Meyers if it were possible to manufacture methamphetamine with the chemicals and glassware found as a result of the search warrant using the ephedrine reduction method. James's counsel objected, arguing that the equipment was incomplete and that there was no evidence of hydriodic acid at the site. The trial court overruled James's objection after the government noted that there had already been testimony that hydriodic acid was found as a result of the search warrant.

The government also presented testimony from James Anthony Childress and Michael Haas, who were both convicted felons and who had both agreed to cooperate with the government. Childress testified that James had sold methamphetamine to Childress. Haas testified that he had helped James obtain ingredients used to manufacture methamphetamine, like those found in the Chard residence and in the trucks belonging to Chard and James.

Michael Ryan, an old friend of James, testified at trial on behalf of James. Ryan testified that at the time of the search, James was no longer living in Chard's home. Ryan also stated that he and James are both against the use of drugs and that Ryan himself has no felony convictions. To rebut Ryan's testimony, over the objection of James's counsel, the testimony of Missouri State Highway Patrol Trooper James Wingo was introduced at trial. Trooper Wingo testified that on October 8, 1994, while he was working as a narcotics investigator, he had purchased from Ryan one ounce of methamphetamine for $1000.

The jury found Chard and James guilty of aiding and abetting the possession of methamphetamine with the intent to distribute methamphetamine. In addition, the jury found James guilty of conspiring to manufacture methamphetamine. Both Chard and James appeal their convictions to this Court.

**II.**

Chard argues that the district court erred when it denied Chard's motion to sever his trial from James's trial. We disagree.

Under Federal Rule of Criminal Procedure 8, the joinder of two defendants is proper if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b); see also United States v. Rimell, 21 F.3d 281, 288 (8th Cir.) ("The prerequisites for joinder are liberally

contrued in favor of joinder."), cert. denied, 513 U.S. 976 (1994). In the instant case, Chard and James were both charged with activities relating to the same continuing criminal activity. Accordingly, their trials were properly joined.

Even if joinder is proper, however, a district court must grant a defendant's motion to sever if it appears that a defendant is prejudiced by a joinder for trial. See

Fed. R. Crim. P. 14.  However, "[t]o obtain a reversal for a failure to sever, defendant must show that the district court abused its discretion, and that the refusal resulted in severe or compelling prejudice." Remell, 21 F.3d at 289.

To demonstrate severe or compelling prejudice, Chard argues that he was not allowed to ask agent Mathews to repeat certain allegedly exculpatory statements that Chard had made to agent Mathews before trial. Specifically, Chard argues that if his trial had not been joined to James's trial, then Chard would have been allowed to ask agent Mathews to repeat to the jury Chard's statement that James was in control of Chard's house and Chard's statement that the papers Chard gave to agent Mathews belonged to James.

However, such testimony by agent Mathews would have been hearsay.  See Fed. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). This type of testimony is inadmissible.  See Fed. R. Evid. 802, 803.  Thus, even if Chard had had a separate trial, this testimony would still have been inadmissible. Chard, therefore, has failed to make a showing of severe and compelling prejudice from the joinder of his trial with James's trial.  Accordingly, we hold that the trial court did not commit reversible error when it denied Chard's motion for severance.

**III.**

Chard contends that the district court erred by admitting the testimony of DEA senior forensics chemist Meyers. Chard argues that, because the existence of the chemical hydriodic acid was never verified at the site of the alleged methamphetamine laboratory and because hydriodic acid is a necessary element to the production of methamphetamine when using the ephedrine reduction method, senior forensics chemist Meyers should not have been allowed to testify that the ingredients found in Chard's

home and in Chard's and James's trucks could be used to manufacture methamphetamine using the ephedrine reduction method.  We disagree.

We review a trial court's decision to admit expert testimony for abuse of discretion.  See United States v. Brown, 110 F.3d 605, 610 (8th Cir. 1997).  Under Federal Rule of Evidence 703, an expert can base his opinion on facts or data "perceived by or made known to the expert at or before the hearing."  Fed. R. Evid. 703.  Senior forensics chemist Meyers based his testimony on the pre-trial examination of photographs and samples taken from the two trucks and Chard's home.  Senior forensics chemist Meyers examined a photograph of the bottle labeled as hydriodic acid, which was still in its manufacturer's packaging, and concluded that the bottle contained hydriodic acid.  In addition, agent Mathews, an experienced DEA agent, testified that he had personally examined the bottle at issue and concluded that it contained hydriodic acid.  Consequently, we hold that the district court did not abuse its discretion by allowing Meyers to testify because there was adequate foundation for his testimony.

**IV.**

Chard argues that the district court erred when it denied Chard's motion for acquittal because there was insufficient evidence to support the verdict.  We disagree.

When reviewing the sufficiency of the evidence to support a conviction, we review the evidence "in the

-14-

light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Smith, 91 F.3d 1199, 1200 (8th Cir. 1996) (quotations and citation omitted).

In the instant case, the evidence was overwhelming that Chard possessed methamphetamine with the intent to distribute it. Chard's own bedroom contained

approximately 56 grams of methamphetamine that had already been packaged in plastic baggies and was ready to be distributed as well as two copies of an instruction manual for the production of methamphetamine. In addition, Chard's truck contained ingredients used to manufacture methamphetamine as well as empty containers of ingredients used to manufacture methamphetamine. Finally, Chard owns the house in which a fully-stocked methamphetamine laboratory--complete with large quantities of the ingredients and equipment needed to manufacture methamphetamine--was found. Consequently, we hold that, viewing the evidence in the light most favorable to the government, there was sufficient evidence to support Chard's conviction.

## V.

James argues that the district court committed reversible error when it admitted the testimony of Trooper Wingo because Trooper Wingo's testimony undermined the credibility of James's witness, Ryan. We disagree.

We will not reverse a trial court's decision to admit evidence absent a clear showing of abuse of discretion. United States v. Roulette, 75 F.3d 418, 423 (8th Cir.), cert. denied, 117 S. Ct. 147 (1996). Furthermore, we have held that trial errors that do not affect constitutional rights are subject to Federal Rule of Criminal Procedure 52(a)'s harmless error standard, under which "[a]n error is harmless if the reviewing court, after reviewing the entire record, determines that no substantial rights of the defendant were affected, and

that the error did not influence or had only a slight influence on the verdict." United States v. Flores, 73 F.3d 826, 832 (8th Cir.) (quotations and citations omitted) (construing Fed. R. Crim. P. 52(a)), cert. denied, 116 S. Ct. 2568 (1996). In order to determine the prejudicial effect of allegedly improper testimony on the defendant's right to a fair trial, we examine the "context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the [defendant's] guilt." Id. (quotations and citations omitted).

Assuming <u>arguendo</u> that the district court erred by allowing Trooper Wingo's testimony, the prejudicial effect of the allegedly improper testimony was at most extremely slight when juxtaposed against the overwhelming evidence otherwise presented against James. James's truck contained six, pint-size jars containing methamphetamine solution, each bottle of which could produce approximately 114 to 143 grams of powder D-methamphetamine. In addition, James's truck also contained ingredients used to manufacture methamphetamine. Moreover, James was living in the house owned by Chard, a house whose basement contained a well-stocked and well-equipped methamphetamine laboratory. Finally, James's own bedroom contained methamphetamine, handwritten notes referring to "dope" and "meth" dealing, and police scanners and radio equipment of the type used by drug dealers taking counter-surveillance measures. In light of the overwhelming evidence of James's guilt, we hold that the alleged error was harmless.

## VI.

For all of the foregoing reasons, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.