UNITED STATES of America,

v.

Ester L. CARTER.

Criminal Action No. 95–435–5.

United States District Court,
E.D. Pennsylvania.

May 22, 1997.

As Amended June 2, 1997.

Mark S. Greenberg, Philadelphia, PA, for defendant.

Terri A. Marinari, William B. Petersen, Philadelphia, PA, for U.S.

MEMORANDUM *

EDUARDO C. ROBRENO, District Judge.

## I. BACKGROUND

A jury found Ester Carter guilty of one count of conspiracy to launder proceeds of a specified unlawful activity, 18 U.S.C. § 1956(h), and two counts of money laundering, 18 U.S.C. § 1956(a)(3)(B). The conviction was the result of Mr. Carter's agreement to lease an office in his Cherry Hill, New Jersey recording studio to one Louis A. Richard, who was in reality Internal Revenue Service (IRS) Special Agent Louis Oubre posing as a drug dealer, for the purpose of laundering money which was represented to Mr. Carter to be the proceeds of drug transactions.

Mr. Carter was introduced to Agent Oubre by Angela Nolan–Cooper, a Philadelphia attorney who represented Mr. Carter's businesses. Ms. Nolan–Cooper had developed an elaborate plan to launder Agent Oubre's purported drug proceeds by hiding some of the money in Bahamian banks and running some of the money through sham businesses. To effectuate the latter plan, Ms. Nolan–Cooper set up LAR Productions, Inc. for Agent Oubre. She told Agent Oubre that to make the business look legitimate he would have to rent office space.

Ms. Nolan–Cooper introduced Agent Oubre to Mr. Carter by phone on March 11, 1994 to discuss Agent Oubre's rental of office space in Mr. Carter's recording studio. The two men met on May 10, 1994 at Mr. Carter's studio, where Agent Oubre expressly told Mr. Carter that his money came from drugs and that Ms. Nolan–Cooper was helping him make it look legitimate. On September 29, 1994, Agent Oubre paid Mr. Carter $6,615 for six months rent and one month security deposit for an office at the recording studio. On December 19, 1994, a lease was drawn up by Ms. Nolan–Cooper which was backdated to July 1, 1994. Mr. Carter and Agent Oubre both signed the backdated lease. On February 1, 1995, Agent Oubre paid Mr. Carter $955 for the January rent. Agent Oubre never moved into the office space at the studio.

Both of Agent Oubre's payments were made by checks payable to Mr. Carter and were drawn on the account of LAR Productions, Inc. and signed by Agent Oubre as Louis A. Richard. Mr. Carter endorsed these checks with his own name and deposited the funds into his personal checking account.

Ester Carter now moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. He contends that he is entitled to a judgment of acquittal based on: 1) the Court's failure to dismiss the indictment for the alleged outrageous government conduct of interfering with the attorney/client relationship between Ester Carter and co-defendant Angela Nolan–Cooper; 2) the Court's failure to preclude the introduction of taped conversations between Angela Nolan–Cooper and Agent Louis Oubre as hearsay not within an exception; 3) the Court's failure to instruct the jury that the mere receipt of property represented to be drug proceeds is insufficient for a conviction under 18 U.S.C. § 1956(a)(3)(B); 4) the assertion that the evidence was insufficient as a matter of law to find that the defendant engaged in a transaction with the intent to conceal or disguise the nature, location, source, ownership or control of drug proceeds; and 5) the Court's limiting of the defendant's cross-examination of Agent Oubre.

## II. DISCUSSION

▮ Federal Rule of Criminal Procedure 29 provides that the trial court "shall order the entry of judgment of acquittal... if the evidence is insufficient to sustain a conviction ...." to Fed.R.Crim.P. 29(a). A motion for judgment of acquittal may be made after the jury returns a verdict of guilty. Fed.

---

* "Upon consideration of defendant Ester Carter's motion for a judgment of acquittal and supporting memorandum (doc. nos. 234, 245 & 250), and the government's response thereto (doc. no. 254), and after a hearing on May 8, 1997, the Court denied the defendant's motion for a judgment of acquittal in a decision delivered from the bench. The Court files this memorandum pursuant to Third Circuit Local Appellate Rule 3.1."

R.Crim.P. 29(c). In determining a post-verdict motion for a judgment of acquittal the Court "must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of witnesses, found the facts, and drew rational inferences." *United States v. Iafelice,* 978 F.2d 92, 94 (3d Cir.1992). The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ "The sole foundation upon which a judgment of acquittal should be based is a successful challenge to the sufficiency of the Government's evidence." *United States v. Frumento,* 426 F.Supp. 797, 802 n. 5 (E.D.Pa. 1976) (finding that defendants' contention that the court erred in determining a government agency could be an "enterprise" was not a proper ground for a judgment of acquittal under Rule 29), *aff'd,* 563 F.2d 1083 (3d Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). *Accord United States v. Rivers,* 406 F.Supp. 709, 711 n. 1 (E.D.Pa.1975) (finding that defendant's arguments that he was denied due process by the government's failure to produce its informant and the failure of the court to give a "missing witness" charge to the jury were not proper grounds for a judgment of acquittal under Rule 29), *aff'd,* 544 F.2d 513 (3d Cir.1976). *See also United States v. Ellis,* 493 F.Supp. 1092, 1098 (M.D.Tenn.1979) (finding that errata in court's instructions to the jury was not a cognizable ground for a post-trial motion for a judgment of acquittal), *aff'd,* 617 F.2d 604 (6th Cir.), *cert. denied,* 449 U.S. 840, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980); 2 Charles A. Wright, *Federal Practice and Procedure: Criminal* § 466, at 654 (2d ed. 1982) ("There is only one ground for

a motion for judgment of acquittal. This is that 'the evidence is insufficient to sustain a conviction' of one or more of the offenses charged in the indictment or information.").

■ Three of the grounds advanced by Mr. Carter clearly are not properly considered for a Rule 29 motion for judgment of acquittal because they challenge the Court's evidentiary rulings and jury instructions instead of the sufficiency of the evidence. A Rule 33 motion for a new trial is the more appropriate method for addressing the allegedly erroneous evidentiary rulings and improper jury instructions. Rule 33 provides, in part, that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." Fed.R.Crim.P. 33. A leading commentator notes that "[a]ny error of sufficient magnitude to require a reversal on appeal is an adequate ground for granting a new trial." 3 Charles A. Wright, *Federal Practice and Procedure: Criminal,* § 556, at 306 (2d Ed.1982). The Court thus interprets these claims by the defendant of error by the Court as a motion for a new trial,[1] applies the appropriate standard and concludes that there was no error that would require a reversal on appeal.

■ Nor is the Court's failure to dismiss the indictment for alleged outrageous government conduct a proper ground for a judgment of acquittal either. Rather claims of outrageous government conduct during the course of the government's investigation of the crime should be raised in a challenge to the indictment. *See* Fed.R.Crim.P. 12(b). *See, e.g., United States v. Voigt,* 89 F.3d 1050, 1060 & n. 2, 1063 (3d Cir.1996) (the defendant filed an unsuccessful pre-trial motion to dismiss the indictment for outrageous government conduct, the defendant's post-trial motions for judgment of acquittal on two counts were granted based only the insuffi-

---

1. While the defendant has not explicitly moved for a new trial, the Court is not prevented from considering that remedy. *See Forman v. United States,* 361 U.S. 416, 425, 80 S.Ct. 481, 487, 4 L.Ed.2d 412 (1960) (granting a new trial when defendant had only moved for a judgment of acquittal because, under 28 U.S.C. § 2106, "the Court of Appeals has full power to go beyond the particular relief sought."); *United States v. Tucker,* 552 F.2d 202, 211 (7th Cir.1977) (granting a new trial when defendant had only moved for a judgment of acquittal because "we do not think justice would be served by denying to [the defendant] the new trial to which he is entitled merely because he made no express prayer therefor").

ciency of the evidence). In this case, the Court already has denied the defendant's pre-trial motion to dismiss the indictment after extensive briefing on the issue and a lengthy and thorough hearing. To the extent that the matter was adjudicated before the trial it would ordinarily not be the subject of a post-trial motion. *But see United States v. Klosterman*, 248 F.2d 191 (3d Cir. 1957) (reversing convictions and remanding case with directions to enter a judgment of acquittal where the district court erred in failing to find entrapment as a matter of law). Nevertheless, the Court has considered anew the defendant's argument for a judgment of acquittal on this ground, and finds no error.

The only clearly appropriate ground on which Mr. Carter seeks a Rule 29 judgment of acquittal is his challenge to the sufficiency of the evidence against him. The defendant's contention that the evidence was insufficient as a matter of law for the jury to find that the defendant engaged in a transaction with the intent to conceal or disguise the nature, location, source, ownership or control of drug proceeds is his only proper grounds for a judgment of acquittal under Rule 29. The Court, however, finds that a judgment of acquittal is not warranted on that ground either, for the reasons that immediately follow.

A. *The Sufficiency of the Evidence that the Defendant Engaged in a Financial Transaction with the Intent to Conceal.*

■ Defendant Carter seeks a judgment of acquittal based on his assertion that the evidence was insufficient as a matter of law to sustain a finding that the defendant engaged in a financial transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of the manufacture, importation, sale, or distribution of controlled substances. *See* 18 U.S.C. § 1956(a)(3)(B). Mr. Carter states that his actions of accepting two checks for rent that were made payable to him personally, endorsed by him, and deposited into his personal checking account did not evidence an intent on his part to conceal those funds. Mr. Carter bolsters his argu-

ment by noting that the checks were signed by Agent Oubre (as Louis A. Richard) and drawn on an account in the name of LAR Productions, Inc. which was opened by one Louis A. Richard. Mr. Carter's proposed conclusion is that the paper trial created was so open and notorious that it refuted any finding by the jury that he had an intent to conceal.

■ In a prosecution for money laundering, "the government must prove that [the defendant] had the specific intent to conceal or disguise the nature, location, source, ownership, or control of property he believed to be the proceeds of unlawful activity." *United States v. Kaufmann*, 985 F.2d 884, 896 (7th Cir.1993). At trial, the government produced tape recordings of the conversations between Agent Oubre and Mr. Carter. At their first face to face meeting, Agent Oubre told Mr. Carter that he had a lot of money, that the money came from drugs and that he wanted to make it look legal:

L.R.: ... And you know, like I was telling you, right now I'm not really interested in so much in making money. You know . . .

E.C.: You're not?

L.R.: ... not right now.

E.C.: Um hmm.

L.R.: I got enough of that.

E.C.: Yeah.

L.R.: You know, but its getting it to where I can use it.

. . .

E.C. If ... if you're discussing money, you want to invest, huh?

L.R.: Well I don't know if she told you where my money comes from?

E.C.: Um hmm.

L.R.: It's drugs. Drugs.

E.C.: Okay. Yeah.

L.R.: You know?

E.C.: Well, that's why I said I didn't know but I figured ...

L.R.: Yeah

E.C.: ... what you was talking about.

. . .

L.R.: It's a bunch of money, and ... and I'm trying to get legal.

E.C.: Um hmm.

L.R.: I'm trying to get ... 'cause right now I can't use it.

E.C.: Um hmm.

L.R.: You know? I can't use it, 'cause...

E.C.: Um hmm.

L.R.... as soon as I start using it, people are gonna start asking questions ...

Transcript of Meeting of May 10, 1994, at 146–48. Mr. Carter then told Agent Oubre that "this here is a good place to start ... you go from there, and it's legal." *Id.* at 151.

Mr. Carter also encouraged Agent Oubre to put on entertainment which they could run through his company or Agent Oubre's company but cautioned him to lay low for a while:

E.C.: Something good come through.

L.R.: Uh huh.

E.C.: ... like a act or something?

L.R.: Uh huh.

E.C.: I can um ... come over, if I think it's a worthwhile investment, and we can run it through my company.

L.R.: Okay.

. . .

E.C.: You ... let's even run it through your company, if you want.

. . .

E.C.: Yeah, but I said ...

. . .

E.C.: ... you ... you stay silent for a while.

L.R.: Yeah. Yeah!

. . .

E.C.: Well, see, that's why I say, uh ... you know, kind of lay dead. Don't ... you don't go get too noticed.

. . .

E.C.: ... you try to stay in the background as much as you can, til this thing, you know ...

L.R.: Right.

E.C.: ... you take a step at a time.

*Id.* at 153–55.

Agent Oubre later in the conversation reminded Mr. Carter of his purpose:

L.R.: Well you know, like I say, right now I'm not worried about making a lot.

. . .

L.R.: And ... I don't mind losing some, ... I'm just trying to get away...

. . .

L.R.: ... to bring the money I got ...

. . .

L.R.... to the forefront....

. . .

L.R.: Where I can use it.

E.C.: Um hmm. But ... I'll help you ... I've been there ... the only way is to stay cool for a while.

*Id.* at 156–57. Agent Oubre also told Mr. Carter that Ms. Nolan–Cooper was trying to get his drug money "where I could start getting some in little banks and stuff like that ... you know, slowly.... It's not under my name, it's under a corporate name." *Id.* at 168.

These conversations, combined with the facts that Mr. Carter: 1) accepted seven months of rent payments from Agent Oubre, who had not even moved into the studio; and 2) had signed a lease in December which was backdated to July, provided substantial evidence for a jury to conclude that Mr. Carter intended to help Agent Oubre conceal the source of his drug money by using the address of Mr. Carter's recording studio for his fictitious corporation. "[A]fter viewing the evidence in the light most favorable to the prosecution," the Court concludes that *"any trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, and, therefore, a judgment of acquittal is not warranted in this case.

B. *The Alleged Outrageous Government Conduct*

Mr. Carter also claims that he is entitled to a judgment of acquittal based on the Court's denial of his motion to dismiss the superseding indictment based on the alleged

outrageous government conduct of interfering with the attorney-client relationship between Mr. Carter and Ms. Nolan–Cooper. The defense of outrageous government conduct was spawned by dicta in the case of *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), where the Court commented: "We may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *Russell*, 411 U.S. at 431, 93 S.Ct. at 1643.

In *Russell* the Supreme Court rejected the defense because it found that the agent's contribution of a key ingredient to an ongoing drug-making enterprise fell, in the words of the Court, "Far short of violating that fundamental fairness shocking to the universal sense of justice mandated by the due process clause of the Fifth Amendment." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643.

In *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the Supreme Court found that the due process clause can be invoked only when, "The Government activity in question violates some protected right of the defendant." *Payner*, 447 U.S. at 737 n. 9, 100 S.Ct. at 2447 n. 9.

▓▓▓ The Third Circuit has applied the doctrine of outrageous Government conduct to reverse a conviction. *See United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). The defendant bears the burden of production and persuasion in establishing that the government's conduct reached a sufficient level of outrageousness to violate her due process rights. *United States v. Voigt*, 89 F.3d 1050, 1070 (3d Cir.1996). The issue of outrageous government conduct is one of law for the court. *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir.1993).

In this case, the protected right that Mr. Carter asserts was violated is the attorney-client privilege. In *United States v. Voigt*, 89 F.3d 1050 (3d Cir.), the Third Circuit recognized that a claim of outrageous government conduct may be brought by a defendant when the government interferes in the relationship between the defendant and his attorney. The *Voigt* court held that as a threshold matter, "the defendant bears the burden of demonstrating the existence of an attorney-client relationship." *Id.* at 1067 n. 6. It further found that,

> in order to raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice.

*Id.* (footnote omitted).

1. *Defendant Must Establish Existence of Attorney–Client Relationship.*

▓▓▓ In the Order of October 7, 1996, the Court found in this case that "[d]efendant Carter had failed to establish the existence of a personal (as opposed to corporate) attorney-client relationship...." Order, Oct. 7, 1996 at 1, ¶ 1. The Court relied on the *Voigt*, where the Third Circuit considered the attorney-client relationship to begin only once the attorney/informant "informed the government that she was representing the Trust and [the defendant] *in connection with the very investigation in which she acted as an informant.*" *Voigt*, 89 F.3d at 1069 (emphasis added).

Here, Ms. Nolan–Cooper never represented Mr. Carter "in connection with the very investigation" in which she gave the government information about Mr. Carter. Therefore, no attorney-client relationship existed regarding this investigation.

Furthermore, defendant Carter failed to carry his burden that Ms. Nolan–Cooper ever represented Mr. Carter personally. The evidence bears out that she called herself his attorney (and Agent Oubre heard this and testified that he thought that she was his attorney), but that could have just as easily been referring to herself in the capacity of representing Mr. Carter's company, since he was a principal in the recording studio. Mr.

Carter's assertions that Ms. Nolan–Cooper handled some landlord tenant matters and matters regarding bill collectors are not conclusive because no evidence was presented to show that those matters were handled for Mr. Carter in his personal capacity and not for Mr. Carter's corporation, as was the case with the lease agreement between Mr. Carter and LAR Productions.

### 2. *The Communication Must Be Confidential.*

The Court further found that "[e]ven if a personal attorney-client relationship existed ... defendant Carter failed to establish that any information disclosed ... was obtained by co-defendant attorney Nolan–Cooper as a result of a confidential communication from defendant Carter to co-defendant attorney Nolan–Cooper." Order, Oct. 7, 1996 at 1, ¶ 2 (footnote omitted). Mr. Carter provided this Court with no evidence that the information divulged to the government by Ms. Nolan–Cooper was privileged beyond the bare assertion that it was communicated to Ms. Nolan–Cooper and that she was his attorney.

■ Under these circumstances, the Court is left to speculate as to the circumstances under which the information was communicated to Ms. Nolan–Cooper. For example, this information could have been obtained by Ms. Nolan–Cooper from Mr. Carter's friends or associates, or Mr. Carter could have made these communications to Ms. Nolan–Cooper in a social setting, in the presence of other associates as well as Ms. Nolan–Cooper. In other words, not only must the communication be conveyed by the client to the attorney but it must be communicated in a manner which was intended for the information to remain confidential.

### 3. *The Privilege Is Not Available to Communications in Furtherance of a Crime or Fraud.*

■ In the October 7, 1996 Order, the Court also found that "[e]ven if an attorney-client relationship existed and the information disclosed ... was a result of confidential communication by defendant Carter to co-defendant attorney Nolan–Cooper, the privilege is not available in that the communica-

tions were in furtherance of a crime of fraud." Order, Oct. 7, 1996 at 2, ¶ 3. It is well settled that the privilege does not adhere to communications to an attorney to further a crime or fraud. Long ago Justice Cardozo noted that "[t]here is a privilege protecting communications between attorney and client. [But t]he privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). More recently, the Supreme Court reasserted the view that

> [t]he attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection— the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—'ceas[es] to operate at a central point, namely, where the desired advice refers *not to prior wrongdoing,* but to *future wrongdoing.*' It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime.

*United States v. Zolin,* 491 U.S. 554, 562–63, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (citations omitted) (emphasis in original).

■ Here, Mr. Carter's communications to Ms. Nolan–Cooper about his profits from illegal video poker proceeds and the financial dealings of his recording studio all related to furthering Ms. Nolan–Cooper's efforts in laundering Mr. Carter's illegally obtained funds.

### 4. *Defendant Failed To Show Prejudice Resulted.*

■ Finally, the Court's Order noted that the disclosed communications "did not result in prejudice to defendant Carter, in that the information disclosed did not involve defendant Carter's legal strategy in this case but, rather, it involved general background about

defendant Carter and his business dealings." Order, Oct. 7, 1996 at 2, ¶ 4.

The *Voigt* court noted that there would be no prejudice if the privileged communications concerned only the workings of the fraudulent Trust in that case and not information related to "legal strategy in resounding to the criminal investigation into [the defendant's] activities." *Voigt*, 89 F.3d at 1071.

> Finally, Voigt invokes our decision in *Levy*, 577 F.2d at 200, along with other similar decisions, in an attempt to have us find that the government's intrusion into his attorney-client relationship, standing alone, is per se prejudicial. *Levy*, however, is distinguishable on two fronts. First, *Levy* was decided under the Sixth Amendment. Second, and more importantly, *Levy*, like most of the cases Voigt has cited, concerned the government's deliberate intrusion into *a defendant's attorney-client relationship in order to gain access to confidential defense strategy.* ... If any privileged information was disclosed to the government in this case, *it concerned the workings of the Trust, not Voigt's legal strategy in responding to the criminal investigation into his activities.*

*Id.* at 1070–71 (emphasis added).

Here, there is no allegation that the information gathered by the government from Ms. Nolan–Cooper had anything to do with Mr. Carter's "legal strategy in responding to the criminal investigation into his activities." *Id.* This is simply because Ms. Nolan–Cooper did not represent Mr. Carter in the criminal investigation. Rather, the information gathered is "concerned with the workings" of his music business and money laundering activities. Therefore, even if privileged, its disclosure was not prejudicial to Mr. Carter. Thus, the government did not engage in the outrageous conduct of interfering with Mr. Carter's attorney-client privilege, and the Court's failure to dismiss his indictment on that ground was not error.

C. *The Court's Failure to Exclude Agent Oubre's Conversations with Ms. Nolan–Cooper of February 7 and 9, 1994*

Defendant Carter claims that it was error for the Court to fail to exclude certain recorded statements made by Angela Nolan–Cooper to Agent Oubre on February 7, 1994 and February 9, 1994. In the first recorded statement at issue, after telling Agent Oubre how to launder his money by hiding it in a Bahamian bank account and by running it through a seemingly legitimate business, Ms. Nolan–Cooper described to Agent Oubre the possibility of investing in an already established business.

> I have someone who's in a very similar situation with you ... that ... has a recording studio.... In South Jersey.... I'll be very honest with you. He has been in it and he's lost money.... He's lost money because he was involved with somebody he shouldn't have been involved with.... But even in losing the money... it's helped him to legitimize everything else.... So he hasn't had any problems. And he's another person that I'm back and forth. I do the same thing with him.... So I mean, that's the one thing that's already established here, if you wanted to become an investor in something like that....

Transcript of Feb. 7, 1994 Meeting, at 19–20. The second recorded conversation at issue took place on February 9, 1994. Ms. Nolan–Cooper was again explaining to Agent Oubre the possibility of investing in Mr. Carter's music business.

> [T]he gentleman who's still involved ... in this business now, ... he started out, he bought some bars ... and he put the poker machines ... and he has made millions and millions of dollars on those poker machines... in his bars. And he doesn't show for it, if you saw him ... and, I mean, he's an older man. He's just in his sixties .... he drives around in a 1971 Chevy Impala.... He wears old clo[thes] ... you would never think. but he was very smart true old man.

Transcript of Feb. 9, 1994 Meeting, at 43–44. It is uncontested that in both of the statements Ms. Nolan–Cooper was referring to Mr. Carter. The Court determined that the statements were admissible against Mr. Carter as non-hearsay under Federal Rule of

Evidence 801(d)(2)(E).[2] Trial Transcript, Nov. 19, 1996, at 141, lines 3–15.

### 1. *When Carter Became a Conspirator and the Existence of a Conspiracy.*

 In his motion in limine and at oral argument, defendant Carter contended that he was not a member of the conspiracy at the time of Ms. Nolan–Cooper's first two meetings with Agent Oubre, when the statements were made. This contention, even if true, does not bar the admission of the statements. As the First Circuit has held, "[o]nce found to be a member of a conspiracy, a defendant is subject to proof of the prior acts and comments of his coconspirators. A statement made by a coconspirator, if in furtherance of the conspiracy, is therefore admissible against the defendant even if made prior to the defendant's involvement in the conspiracy." *United States v. Masse,* 816 F.2d 805, 811 (1st Cir.1987). Since Mr. Carter was found to be a member of the conspiracy[3] and, as discussed infra, the statements were made in furtherance of the conspiracy, the admission of the statements was not error regardless of whether Mr. Carter had begun his involvement in the conspiracy at the time of the statements.

### 2. *The Statements Were Made in the Course of A Conspiracy Factually Intertwined with the Charged Conspiracy.*

The indictment charged a conspiracy to launder proceeds of illegal activities beginning "from at least February 1994." Superseding Indictment Count III at 9. However, the Government has acknowledged that the conspiracy charged was formed in February of 1994 and that the object of the conspiracy was the laundering of drug proceeds. Trial Transcript of Nov. 14, 1996, at 24.[4]

 Defendant Carter contends that because the statements were not made in the course of the conspiracy charged in the in-dictment they were not properly admitted. To that end, Mr. Carter alleges that even if there was an agreement in place between Ms. Nolan–Cooper and himself prior to Ms. Nolan–Cooper's February 7, 1994 meeting with Agent Oubre, this was an agreement to launder video poker proceeds. By contrast, according to Mr. Carter, the agreement which germinated from that first meeting between Ms. Nolan–Cooper and Agent Oubre was an agreement to launder drug proceeds. Mr. Carter notes, accurately, that a person cannot alone conspire with a government agent in the absence of other non governmental co-conspirators. Therefore, according to Mr. Carter, the statements at issue could not have been made in the course of the conspiracy to launder drug proceeds, the one charged in the indictment, since at the time the statements were made, the conspiracy was not yet in place. Mr. Carter's argument is unavailing.

 Mr. Carter's argument fails to recognize that " 'conspiracy' as an evidentiary concept, embodied in Rule 801(d)(2)(E), and 'conspiracy' as a concept of substantive criminal law are not coterminous." *United States v. Kendall,* 665 F.2d 126, 130 (7th Cir.1981). "An out of court statement is admissible pursuant to Rule 801(d)(2)(E) if the judge finds 'that the declarant and defendant were members of *a* conspiracy at the time the hearsay statement was made, and the statement was made in furtherance of the conspiracy.' " *Id.* at 131 (quoting *U.S. v. Santiago,* 582 F.2d 1128, 1134 (7th Cir.1978)) (emphasis added). On the other hand, the charged conspiracy defines the nature of the crime and the period of time for which the defendant is being held liable. *See United States v. Trowery,* 542 F.2d 623, 627 (3d Cir.1976) ("Since the quantum and nature of evidence required for the application of the co-conspirator exception differs from that required for the crime of conspiracy .... [i]t

---

**2.** Federal Rule of Evidence 801(d)(2)(E) excepts from the definition of hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

**3.** Trial Transcript, Nov. 19, 1996, at 141, lines 5–6.

**4.** The government's limitation was self-imposed, as the superseding indictment is not so limiting, charging the conspiracy began "from at least February 1994." Superseding Indictment Count III at 9.

follows, therefore, that the absence of a conspiracy count has no bearing on the court's determination of the competence of co-conspirator evidence."), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977).

 This principle was applied in *United States v. Gotti,* 644 F.Supp. 370 (E.D.N.Y. 1986). At issue in *Gotti* were statements allegedly made by co-conspirators *after* the time period of the conspiracy charged in the indictment. The Court admitted the statements under Rule 801(d)(2)(E) finding that "the conspiracy to which [the co-conspirator exception] refers need not be identical [to the] conspiracy charged in the indictment. At least, provided there is proof, relevant in the case, of some related conspiracy in which the [co-conspirators] were members at the time of the statements, [the statements] are made 'during the course' of a conspiracy for purpose of the rule." *Id.* at 374 (citation omitted). Thus, the test for admissibility of co-conspirator statements made outside the period of the conspiracy charged in the indictment is whether "the conspiracy introduced into evidence by the Government, although not charged, was factually intertwined with the offense for which the defendant is being tried." *United States v. Lyles,* 593 F.2d 182, 194 (2d Cir.), *cert. denied sub nom., Holder v. United States,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979).

In this case, at the conclusion of the Government's case, the Court made the following findings:

THE COURT: Well, okay, Mr. Petersen [counsel for the government]. Before you sit down here let me be sure that I understand your theory of the case here. The theory of the case is that there was a conspiracy in place that preceded February of 1994 and that involved Nolan–Cooper, Carter and others, and there was a conspiracy to money launder. In February of '9[4] Agent Oubre, as a Government official, joined that conspiracy and brought in a new source of money, but that was a conspiracy that was in place.

MR. PETERSEN: That is the Government's position, yes.

THE COURT: In light of that, if that is the Government's position, then the statements which have been made, which you have cited to, it seems to me show that there was a conspiracy in existence, that the declarant was a member of that conspiracy; that a defendant against whom the statement is offered, in this case Defendant Carter, was a member of that conspiracy; that the statements were made in furtherance of that conspiracy and that they were made to among other things reassure a new conspirator or potential conspirator to join the conspiracy; and that, therefore, they were made during the course of that conspiracy. So, if that is the—your theory of the case then it is clear that the statements are co-conspirator statements.

Trial Transcript, Nov. 19, 1996, at 140, lines 17–25, and at 141, lines 1–15.

The Court concludes that the statements, even if made by Ms. Nolan–Cooper in the course of the conspiracy to launder video poker proceeds, were made in the course of a conspiracy factually intertwined with the conspiracy to launder drug proceeds charged in the indictment. Therefore, the statements of codefendant Nolan–Cooper were properly admissible against defendant Carter.

### 3. *Harmless Error Analysis.*

 Assuming arguendo that the Court erred in admitting the statements, such an error would be harmless under the circumstances of this case. Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). The Third Circuit has held that an error is harmless when "we are ... left with 'a sure conviction that the error did not prejudice the defendant.' ... and can say that it is 'highly probable' that the district court's errors did not contribute to [sic] jury's judgment of conviction." *United States v. Casoni,* 950 F.2d 893, 902 (3d Cir. 1991) (quoting *United States v. Stevens,* 935 F.2d 1380, 1406–07 (3d Cir.1991)) (internal quotations and citations omitted).

The First Circuit has shed light on some of the factors to be considered in determining whether an error is harmless:

There is no bright-line rule for divining when particular errors that result in a jury's exposure to improper evidence are (or are not) harmless. Rather a harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue.

*United States v. Sepulveda*, 15 F.3d 1161, 1182 (1st Cir.1993) (holding that the erroneous admission of two statements under the co-conspirator exception were harmless because of the overwhelming evidence against the defendant), *cert. denied*, 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

Applying the *Sepulveda* teachings and examining the present case as a whole, the Court concludes that, if it was error to admit the statements at issue, the error is harmless. Firstly, the admitted statements were not central to the case against Mr. Carter; basically the statements consisted of background information intended to reassure Agent Oubre that Ms. Nolan–Cooper had a team in place able to carry out the object of the conspiracy. *See United States v. Escobar*, 50 F.3d 1414, 1423 & nn. 4 & 6 (8th Cir.1995) (holding that even if statements used by the government to show how the conspiracy was formed were wrongfully admitted under the co-conspirator exception such an error would be harmless given the overwhelming evidence against the defendant). Secondly, Mr. Carter's primary defense was not that he did not commit the acts alleged in the conspiracy but that he did not have the required intent to conceal the source of Agent Oubre's funds. The admitted statements do not bear on Mr. Carter's intent.

Thirdly, the evidence captured in the statements was not the only evidence against Mr. Carter. Rather, there was significant additional evidence, much of it in his own voice and words captured on the tape recordings, that Mr. Carter intended to engage in money laundering. The government produced several recorded conversations between the undercover agent and the defendant. The conversations demonstrated that Mr. Carter was told and acknowledged that the agent's money was purportedly from drugs, that the agent wanted the money laundered so that he could use it, and that he was using the business, set up by codefendant Nolan–Cooper, to disguise the source of his money. The taped conversations also show that Mr. Carter reassured Agent Oubre that the agent was going about it the right way and Ms. Nolan–Cooper and he (Mr. Carter) would help to show Agent Oubre how to do it. *See supra* Section A. With this understanding, Mr. Carter accepted rent from the agent's sham business, even though Agent Oubre never actually opened an office in Mr. Carter's recording studio. Mr. Carter also signed a backdated lease for the rental. The government has produced the lease and the cancelled checks as evidence of Mr. Carter's actions. Mr. Carter was also heard on tape to solicit the agent's money for other projects. *Id.* The presence of additional similar evidence militates against a finding of reversible error. *See United States v. Williams*, 44 F.3d 614, 618 (7th Cir.1995) (holding that even if the statements defendant claimed were made before the conspiracy had been admitted improperly, the evidence from two eyewitnesses after the defendant's contended conspiracy starting point made any error in the previous statements harmless).

Finally, the statements were put to minimal use by the government, with one reference to the statements in the government's opening remarks, Trial Transcript of Nov. 15, 1996, at 15–16, and a single tangential reference to the first statement made during the government's closing argument. Trial Transcript of Nov. 20, 1996, at 45–46. *See United States v. Whalen*, 844 F.2d 529, 534 (8th Cir.1988) (holding the admission of statements under the co-conspirator exception was harmless where the statement came out on cross examination, the government mentioned it in only one sentence during its closing argument and the evidence against the defendant was "quite strong"). *Cf. United States v. Vowiell*, 869 F.2d 1264, 1270–71 (9th Cir.1989) (holding it was not harmless

error to wrongfully admit a statement under the co-conspirator exception where the "evidence of guilt was formidable but not overwhelming and the statement was important to the government's case," and the government relied heavily on the statement in questioning the defendant and in closing argument).

Given the weight and quality of the evidence against Mr. Carter, and in the absence of any indication that the admission of the statements affected the jury's determination of Mr. Carter's involvement in the conspiracy, the Court finds that even if it was error to admit the statements, the error did not contribute to the jury's judgment of conviction and would, therefore, be harmless. *Casoni*, 950 F.2d at 902.

### D. *The Court's Failure to Include Defendant Carter's Jury Instruction on Intent.*

 Defendant Carter seeks a judgment of acquittal on the grounds that the Court erred in failing to instruct the jury that the mere receipt of property represented by a law enforcement agent as proceeds of the sale of drugs is insufficient to sustain a conviction under 18 U.S.C. § 1956(a)(3)(B). Which instructions are given to the jury are within the sound discretion of the Court. *See United States v. Simon*, 995 F.2d 1236, 1243 n. 11 (3d Cir.1993); *United States v. Carter*, 756 F.2d 310, 314 (3d Cir.1985), *cert. denied*, 478 U.S. 1009, 106 S.Ct. 3307, 92 L.Ed.2d 721 (1986). A defendant is not entitled to the jury instruction of his choosing or in his particular language. *See, e.g., United States v. Salerno*, 66 F.3d 544, 549 (2d Cir. 1995); *United States v. Collins*, 66 F.3d 984, 987 (8th Cir.1995).

The jury instruction submitted by Mr. Carter was:

The defendant Ester Carter has been charged with conspiracy and two substantive counts of violating 18 U.S.C. § 1956(a)(3)(B) which reads, in relevant part:

Whoever, with the intent—to conceal or disguise the nature, location, source, ownership or control of property believed to be proceeds of unlawful activi-

ty... conducts or attempts to conduct financial transactions represented to be the proceeds of specified unlawful activity shall be... fined ... or imprisoned ... or both.... [T]he term "represented" means any representation made by a law enforcement officer....

Section 1956(a) (3)(B) requires the government to prove three elements:

1. The defendant conducted or attempted to conduct a financial transaction;

2. The financial transaction involved property a law enforcement agent represented to be the proceeds of the manufacture, importation, sale, or distribution of controlled substances; and

3. The defendant engaged in this financial transaction with the intent to conceal or disguise the nature, location, source, ownership or control of property believed to be proceeds of the manufacture, importation, sale, or distribution of controlled substances.

Under § 1956(a)(3)(B), *it is not enough for the government [to] prove only that the defendant accepted "drug money" from the undercover agent. The government must also prove that the defendant accepted this money or entered into a conspiratorial agreement, with the intent to conceal or disguise the nature, location, source, ownership or control of property believed to be the proceeds of the [sic] manufacture, importation, sale, or distribution of controlled substances. If the government does not prove that the defendant intended to conceal or disguise the nature, location, source, ownership or control of property he believed to be the proceeds of the manufacture, importation, sale, or distribution of controlled substances, the government has not proven its case even if it proves that the defendant accepted money a government agent represented to be drug money.*

Def. Carter's Proposed Jury Instructions, at 5–6 (emphasis added). Mr. Carter cited only 18 U.S.C. § 1956(a)(3)(B) as authority for this instruction.

The Court found that this jury instruction was redundant in emphasizing the intent ele-

ment of the crime. Trial Transcript, Nov. 20, 1996, at 29. The Court instead opted to give the jury instruction proposed by the government on this issue. The jury instruction given by the Court was:

Now, the crime of conducting an illegal financial transaction and charged in Counts 23, 24, 25 and 26 has three essential elements. This is a crime of money laundering. Those elements are:

One, on or about the date set forth in the superseding indictment, the defendant knowingly conducted or attempted to conduct a financial transaction, which in any way or degree affected interstate or foreign commerce.

Two, the financial transaction or attempted financial transaction involved property represented by a law enforcement officer to be proceeds of a specified unlawful activity. In this case, the buying, selling and dealing in narcotic and dangerous drugs.

Three, *the defendant conducted a financial transaction with the intent to conceal or disguise the nature, location, source, ownership or control of the property which defendant believed to be the proceeds of the buying, selling and dealing in narcotic and dangerous drugs.*

A defendant may be found to have attempted to conduct a financial transaction if he intended to conduct a financial transaction and voluntarily and intentionally carried out some act which was a substantial step toward conducting that financial transaction, even if the transaction was never completed. The term conducted, includes initiating, concluding or participating in initiating or concluding the transaction.

It is not necessary to show that a defendant intended to commit the drug trafficking crime himself. It is sufficient that in conducting or attempting to conduct the financial transaction, the defendant intended to make the unlawful activity easier or less difficult.

The crime charged in Counts 23, 24, 25 and 26 of the Superseding Indictment al-

leges that the defendants knew that the transactions were conducted or attempted for the purpose of concealing and disguising the nature, location, source, ownership or control of money which the defendants believed to be proceeds from illegal drug activity.

Trial Transcript, Nov. 20, 1996, at 132–33 (emphasis added).

The instruction given is taken almost word for word from the *Manual of Modern Criminal Jury Instructions for the District Courts of the Eighth Circuit,* § 6.18.1956H (1996), which is specifically for money laundering under 18 U.S.C. § 1956(a)(3)(B). The Court believes that the instruction adequately describes the fact that the government was required to show that the defendant had the intent to conceal. Therefore, it was within the Court's discretion to decline to give the defendant's additional instruction because to do so would have been redundant.

E. *The Court's Failure to Allow Defendant's Proffered Cross–Examination Questions.*

Prior to trial, the government filed a motion in limine seeking to preclude cross-examination of Agent Oubre on findings the Court made in an earlier hearing that: 1) Agent Oubre had engaged in sexual relations with Ms. Nolan–Cooper during the investigation; and 2) that he testified untruthfully at the hearing. The defendant objected to the government's request by stating that he wished to show that Agent Oubre had a motive to testify favorably for the government because the government would determine whether he would receive any discipline or criminal charges from his acts. The Court reserved ruling on the issue until after Agent Oubre's testimony. Trial Transcript, Nov. 14, 1996, at 40, lines 6–8.

At trial, Agent Oubre testified as to the foundational basis for the authenticity of the tape recordings and the accuracy of the transcripts of the tape recordings which the government had prepared. Trial Transcript, Nov. 15, 1996, at 34–58.[5] After Agent Ou-

---

5. The government's direct examination began as follows and continued essentially the same

throughout Agent Oubre's testimony:

bre's testimony was completed, the Court held a sidebar conference with counsel. During the sidebar, the Court asked counsel for the defendants to proffer what questions they would ask of Agent Oubre on cross-examination. Mr. Carter's attorney, Mark Greenberg, indicated he would ask Agent Oubre,

> If [Agent Oubre is] aware of the fact that he testified at a prior proceeding in this matter involving allegations of misconduct on his part and neglecting—what I think the allegations are that's relevant. [Agent Oubre is] aware of the fact that this Court was present during the testimony, he was under oath. [Agent Oubre is] aware of the fact that this Court concluded that he had lied with respect to certain issues.
>
> I would then ask [Agent Oubre] if he's aware that lie opens him up to possible perjury prosecution and possible obstruction of justice. If [Agent Oubre is] aware of the fact that the—that perjury prosecution and obstruction of justice charges is [sic] from the United States Attorney's Office. And, if [Agent Oubre is] aware of the fact, Mr. Petersen is a member of the United States Attorney's Office. If

> [Agent Oubre is] aware also of the fact that this Court's finding may result in administrative proceedings against him by the Internal Revenue Service. And, that's basically what I wanted to ask on the issue.

Trial Transcript, Nov. 15, 1996, at 64, lines 2–18.

Rule 611(b) limits the scope of cross-examination "to the subject matter of direct examination and matters affecting credibility of the witness...." Fed.R.Evid. 611(b). In enacting Rule 611, Congress endorsed the practice "that an unfolding of the facts in an orderly fashion usually will save time and promote the truth." 28 Charles A. Wright and Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6162, at 341 (1993) (footnote omitted).[6] As a leading commentator has observed, "by limiting cross-examination to the subject matter of direct, subdivision (b) [of Rule 611] precludes the cross-examiner from creating diversions and digressions into different topics that may confuse or otherwise unfairly prejudice the jury." *Id.* § 6165, at 393. "[A] Court has a duty to exercise its powers under Rule 611 where there is no need for the evidence

---

AUSA PETERSEN: Good afternoon Agent Oubre. Agent Oubre were you the undercover agent assigned to this investigation?

AGENT OUBRE: Yes, I was.

AUSA PETERSEN: What undercover name did you use?

AGENT OUBRE: Louis A. Richard.

AUSA PETERSEN: Agent Oubre, I'd like to show you what has been marked Government's Exhibit S–1.

. . .

Agent Oubre, could you take a moment and look at that and identify it for us?

Agent Oubre: Yes, that is an audio and video recording of a meeting between myself, Angela Cooper and a cooperating individual by the name of Ozzie McBride that took place on February 2nd, 1994 at approximately 6:00 p.m.

AUSA PETERSEN: Agent Oubre, have you listened and watched this videotape?

AGENT OUBRE: Yes, I have.

AUSA PETERSEN: Does it accurately reflect the events in your conversations?

AGENT OUBRE: Yes, it does.

. . .

AUSA PETERSEN: [after handing the agent a loose-leaf binder] Agent Oubre, I'd like you to open that loose-leaf binder if you could and turn to what has been marked as T–1?

. . .

Could you identify that for us?

AGENT OUBRE: Yes, T–1 is a transcript of S–1.

. . .

AUSA PETERSEN: Have you reviewed this transcript?

AGENT OUBRE: Yes, I have.

AUSA PETERSEN: Does it correctly identify the speakers?

AGENT OUBRE: Yes, it does.

AUSA PETERSEN: Is the transcript an accurate transcription of the conversation?

AGENT OUBRE: Yes, it is.

Trail Transcript, Nov. 15, 1996, at 34–36.

6. [T]he rule gives trial courts broad powers to control the 'mode and order' of what is otherwise admissible evidence. Importantly, subdivision (a) commands that courts 'shall' exercise this power. A command is given because the active involvement of the court in such matters is deemed essential to achieving the policy goals of this rule. This is because when trial counsel in an adversary system present evidence, they are less concerned with truth, economy, or witness sensibilities than they are with winning. Thus the function of Rule 611 is to compel the trial courts to control the threats to these values presented by the manner in which the adversaries present evidence. *Id.* § 6162, at 338 (footnotes omitted).

offered or where the only point of an examination is to gain partisan advantage by intimidating the ·witness or prejudicing the jury against him." *Id.* § 6162, at 343.

Mr. Carter argues that, although this inquiry goes beyond the scope of direct, it is permissible under Rule 611 because it calls into question the credibility of the witness. In his memorandum opposing the government's motion in limine, defendant Carter contended that the Court's earlier findings that Agent Oubre had sexual relations with Ms. Nolan–Cooper during the investigation and that his testimony was found to be not credible subjects Agent Oubre to both criminal and disciplinary action. Defendant Carter asserted that the fact that the government controls the prosecution of those actions gives Agent Oubre a motive or bias to testify in a manner which satisfies the government, thereby affecting his ability to testify truthfully.

■■■ A witness' bias is, of course, an important issue when weighing his credibility. "The partiality of the witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 3A J. Wigmore, *Evidence* § 940 (Chadbourn rev.1970)). However, if the testimony of the witness is essentially not in dispute, credibility is not an issue. To put it another way, "[a] defendant has a right to cross-examine as to bias except where such an inquiry would be irrelevant to establishing the credibility of the witness." *United States v. Houghton,* 554 F.2d 1219, 1225 (1st Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). The Court thus prohibited the proffered cross-examina-

tion on the basis that it did not involve matters of credibility under Federal Rule of Evidence 611(b). Trial Transcript, Nov. 15, 1996, at 65.

■■■ Further, the Court found that even if the statements were admissible under Rule 611(b), it should be excluded under Federal Rule of Evidence 403.[7] Rule 403 "calls for 'balancing the probative value of and need for the evidence against the harm likely to result from its admission.'" *United States v. Gatto,* 995 F.2d 449, 456–57 (3d Cir.) (quoting Fed.R.Evid. 403, Advisory Committee Notes), *cert. denied,* 510 U.S. 948, 114 S.Ct. 391, 126 L.Ed.2d 339 (1993). The Third Circuit has observed that "[i]n applying this test, we must assess the 'genuine need for the challenged evidence and balance that necessity against the risk that the information will [improperly] influence the jury....'" *United States v. Sriyuth,* 98 F.3d 739, 747–48 (3d Cir.1996) (quoting *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988)), *cert. denied,* ── U.S. ──, 117 S.Ct. 1016, 136 L.Ed.2d 892 (1997). The factors to be considered in the balancing process are: " 'the actual need for that evidence in view of the contested issues and the other evidence available to the [party seeking admission], and the strength of the evidence in proving the issue, against the danger that the jury will be inflamed....'" *Id.* at 748 (quoting *United States v. Cook,* 538 F.2d 1000, 1003 (3d Cir.1976) (internal quotations and citations omitted).

In reaching its decision to limit the defendants' cross-examination of Agent Oubre, the Court considered that both defendants had stipulated that the tapes met the requirements for authentication under *Starks,*[8] *id.* at

---

7. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

8. ·In *United States v. Starks,* 515 F.2d 112 (3d Cir.1975), the Third Circuit noted that the introduction of tape recordings as evidence raises potential problems of "alteration, tampering and selective editing." *Id.* at 121. The court found

that "the burden is on the [party wishing to introduce the tape recordings] 'to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings....'" *Id.* (quoting *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967)). The Third Circuit adopted the standard articulated by the Southern District of New York for laying such a foundation:

... before a sound recording is admitted into evidence, a foundation must be established by showing the following facts: (1) That the re-

55–56, and that, therefore, there was no assertion by the defendants that Agent Oubre had not testified *truthfully during the government's* direct examination. Trial Transcript, Nov. 14, 1996, at 34–35, 55–57. To be sure, the Court engaged in the following colloquy with counsel for both defendants:

> THE COURT: No. There is no dispute, as I understand it, Mr. Greenberg[, counsel for defendant Carter,] and Mr. C[lark, counsel for defendant Ellis], that the tapes were made on the dates the Government contends the tapes were made.
>
> MR. GREENBERG: That's correct sir.
>
> THE COURT: There is no dispute that the voices which appear on the tape, who can be heard on the tape, are the voices of those individuals that the agent claims are heard on the tapes.
>
> . . .
>
> MR. GREENBERG: Preliminarily, no.
>
> THE COURT: Okay. Is there—there is no controversy that the agent was employed as an agent of the United States on the dates the tapes were made, and that he made the tapes.
>
> MR. GREENBERG: That's correct.

*Id.* at 34, lines 11–25, & at 35, lines 1–2. A similar colloquy occurred later the same day:

> THE COURT: Okay. *So there is no question of the authenticity of these tapes.*
>
> MR. CLARK: *I have none on behalf of Mr. Ellis.*
>
> THE COURT: *Okay. Mr. Greenberg?*
>
> MR. GREENBERG: *Your honor there is no problem with that* . . . .

*Id.* at 55, lines 23–25 & at 56, lines 1–4 (emphases added).

Because there is no contested issue as to the authenticity of the audio tapes introduced by Agent Oubre on direct examination, his potential bias would be of little probative value. By contrast, it is clear that the purpose for the proposed cross-examination of

Agent Oubre was not credibility but rather to bring before the jury repugnant misconduct on the part of the lead government agent. Given its purpose, the proffered cross-examination questions would have had a tendency to inflame the jury resulting in significant prejudice. On balance, the Court finds that the probative value of the proffered cross-examination is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

Finally, similar bias probes have been prohibited on cross-examination where the witness' testimony is not crucial to convicting the defendant. The First Circuit affirmed the district court's decision to bar a defendant from asking government agents cross-examination questions regarding contempt proceedings brought against the agents as a result of their conduct in the case. *Houghton,* 554 F.2d at 1225. The court stated that "limitations upon cross-examination must be examined in light of the circumstances of each case. . . ." *Id.* It noted that "[a]n important consideration is the importance of the witness' testimony in convicting the defendant." *Id.* at 1225–26. It held that because "the agents' testimony was the same as was outlined in the Jencks Act material that had been delivered to defense counsel" (provided before the contempt charges) that there was no sign of bias on the part of the government agents against the defendant. *Id.* at 1226. *See also United States v. Landes,* 704 F.2d 152 (5th Cir.) (holding that it was within the trial court's discretion to weigh the prejudice and materiality under Rule 403 in excluding the evidence of possible bias of a government agent who was a witness against the defendant), *cert. denied,* 464 U.S. 856, 104 S.Ct. 176, 78 L.Ed.2d 158 (1983).

At trial, the testimony of Agent Oubre played a de minimis role. Moreover, like the agent in *Houghton,* Agent Oubre had testified to the authenticity of the tapes prior to

---

cording device was capable of taking the conversation now offered into evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made to the recording. (5) That the recording had been preserved in a manner that is shown to the court. (6) That the speakers are identified. (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* at 121 & n. 11 (quoting *United States v. McKeever,* 169 F.Supp. 426, 430 (S.D.N.Y.1958)).

the Court's finding that he had sexual relations with Ms. Nolan–Cooper. Because his testimony was substantially the same as that which he had provided before the accusation was made that he had testified untruthfully, and he did not stray beyond the ministerial function of authenticating audio tapes, the probative value of the proffered cross-examination was minimal.

The Court, therefore, finds no error in excluding the proffered cross-examination of Agent Oubre.